Declaration of Jason D. Stigge

**DECLARATION OF JASON D. STIGGE, P.E.
REGARDING U.S. PATENT NO. 9,706,026**

Declaration of Jason D. Stigge

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................8

II.  BACKGROUND AND QUALIFICATIONS ....................................9

III. MATERIALS CONSIDERED ..........................................................10

IV.  MY UNDERSTANDING OF CERTAIN LEGAL STANDARDS ................11

    A.   Ordinary Skill in the Art ..........................................................11

    B.   Claim Construction ...................................................................12

    C.   Anticipation (35 U.S.C. § 102) ................................................12

    D.   Obviousness (35 U.S.C. § 103) ................................................13

V.   THE '026 PATENT .........................................................................15

    A.   Challenged Claims ....................................................................18

    B.   Prosecution History of the '026 Patent ....................................21

VI.  PERSON OF ORDINARY SKILL IN THE ART ...........................24

VII. OVERVIEW OF TECHNOLOGY AND ASSERTED PRIOR ART .............25

    A.   Overview of Braitberg. ..............................................................25

    B.   Overview of Woud .....................................................................26

    C.   Overview of Kogan ....................................................................28

    D.   Overview of Li ...........................................................................30

    E.   Overview of Rudisill ..................................................................30

VIII. SUMMARY OF MY OPINIONS ..................................................31

IX.  The Claim terms "a male connector" and "a female connector" are indefinite and were used inconsistently during prosecution. ...................................33

Declaration of Jason D. Stigge

A.    The Terms "A Male Connector" And "A Female Connector" Are Indefinite Based On The Specification.................................................................33

B.    The Terms "A Male Connector" And "A Female Connector" Are Used Inconsistently In Prosecution History Based On The Discussion of Braitberg...39

C.    The Discussion Of Kogan In The Prosecution History Is Inconsistent And Contradicts The "Male Connector." ....................................................40

D.    NPI's Use Of The Term "Male Connector" Evidences Further Indefiniteness. ...................................................................................41

E.    NPI's Use Of The Term "Female Connector" Evidences Further Indefiniteness. ...................................................................................42

X.   The Claim terms "Rim" and "rim to guide proper mating are indefinIte.........44

A.    The First "Rim" Structure of the '026 Patent. ...............................45

B.    The Second "Rim" Structure of the '026 Patent.............................48

C.    The Third "Rim" Structure of the '026 Patent................................51

D.    The Fourth "Rim" Structure of the '026 Patent.............................52

E.    The Fifth "Rim" Structure of the '026 Patent.................................53

F.    The Sixth "Rim" Structure of the '026 Patent. ...............................54

G.    Summary Of Indefiniteness Of "Rim" And "Rim To Guide Proper Mating." 56

XI.  the terms "tray" and "base receiver" are not defined in the specification and are used inconsistently throughout the specification, resulting in indefiniteness. ..57

XII. "Docking support surface," "female portion" and "male portion" should be determined from the specification. ..........................................................61

A.    "Docking Support Surface." ........................................................61

B.    "Female Portion" And "Male Portion." ........................................63

XIII.    THE CHALLENGED CLAIMS ARE INVALID .......................................63

A.     Ground 1: Claims 1, 2, 6, 10, 11, 12, 14, 17 and 19 are Anticipated by, or Rendered Obvious in View of Woud ...................................................................63

    1.     Claim 1 .................................................................................................63

    2.     Claim 2 .................................................................................................73

    3.     Claim 6 .................................................................................................74

    4.     Claim 10 ...............................................................................................75

    5.     Claim 11 ...............................................................................................83

    6.     Claim 12 ...............................................................................................85

    7.     Claim 14 ...............................................................................................86

    8.     Claim 17 ...............................................................................................87

    9.     Claim 19 ...............................................................................................88

B.     Ground 2: Claims 1 and 4 are unpatentable because they were obvious over Braitberg in view of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3 ...........................................................................................................91

    1.     Claim 1 .................................................................................................91

    2.     Claim 4 .................................................................................................98

C.     Ground 2b: Claim 1 is Unpatentable as obvious over Kogan in view of the knowledge of a POSA or of Carnevali 1, Carnevali 2, or Carnevali 3 ...............99

    1.     Claim 1 .................................................................................................99

D.     Ground 2c: Claim 1 is unpatentable over Braitberg in view of Li and/or Rudisill ....................................................................................................................107

E.     Ground 3a: Claim 10, 11, 14 and 19 are Unpatentable as Obvious over Song in view of the knowledge of a POSA and/or Li and/or Rudisill .............110

    1.     Claim 10 .............................................................................................110

    2.     Claim 11 .............................................................................................118

    3.     Claim 14 .............................................................................................119

    4.     Claim 19 .............................................................................................121

F.     Ground 3b: Claim 15 is Unpatentable under 35 U.S.C. ¶103(a) over Song in view of the knowledge of a POSA or Li or Rudisill and in further view of Braitberg ................................................................................................................121

Declaration of Jason D. Stigge

G.    Ground 4a: Claims 10, 11, and 19 are Anticipated by, or, in the Alternative, Obvious in View of Rudisill. ...............................................................122

1.    Claim 10 ...........................................................................................122

2.    Claim 11 ...........................................................................................125

3.    Claim 19 ...........................................................................................126

XIV.    NO SECONDARY CONSIDERATIONS ................................................127

XV. The Asserted Claims of the '026 Patent are not entitled to the February 23, 2015 filing date of priority application pct/us2015/017131 ..................................127

XVI.    CONCLUSION ..........................................................................................132

Declaration of Jason D. Stigge

## LIST OF EXHIBITS REFERENCED IN DECLARATION

Declaration of Jason D. Stigge

| Exhibit # | Description |
|---|---|
| A | U.S. Patent No. 9,706,026 ("the '026 Patent") |
| B | File History of U.S. Pat. App. No. 14/936,517 which issued as the'026 |
| C | U.S. Pat. Pub. No. 2015/0244126 A1 ("Carnevali 1") |
| D | WO 2015/127376 A1 ( "Carnevali 2") |
| E | U.S. Pat. Pub. No. 2015/0241931 A1 ("Carnevali 3") |
| F | U.S. Pat. No. 5,535,274 ("Braitberg") |
| G | U.S. Pat. No. 7,480,138  ("Kogan") |
| H | U.S. Pat. Pub. No. 2013/0273752 A1 ("Rudisill") |
| I | Chinese Patent No. CN 202565335 U ("Li") |
| J | English Translation of Chinese Patent No. CN 202565335 U ("Li") |
| K | Korean Patent No. KR20-0265673 |
| L | English Translation of Korean Patent No. KR20-0265673 |
| M | PO Asserted Claims and Infringement Contentions – '026 Patent |
| N | U.S. Pat. No. 7,859,222 ("Woud") |
| O | Declaration of Kimberly K. Cameron, Ph.D., P.E. on behalf of GPS |
| P | Gamber-Johnson LLC v. NPI IPR2021-01159 Petition for IPR |
| Q | Declaration of Jason Lewandowski re Case IPR2021-01159 |
| R | Technopedia definition of "male connector" (https://www.techopedia.com/definition/8234/male-connector) |
| S | Technopedia definition of "female connector" (https://www.techopedia.com/definition/15991/female-connector) |
| T | McGraw Hill Dictionary of Scientific and Technical Terms, Sixth Edition, definition of "male connector" (p. 1274) |
| U | McGraw Hill Dictionary of Scientific and Technical Terms, Sixth Edition, definition of "female connector" (p. 785) |
| V | Jason Stigge Rule 26 Deposition Testimony |
| W | Jason Stigge Curriculum Vitae "CV" |
| BI | Claim Chart Not Entitled to 2-24-2014 Priority |
| BJ | Claim Chart Not Entitled to 3-21-2014 Priority |
| BK | Claim Chart Not Entitled to 8-21-2014 Priority |

| BL | Claim Chart Not Entitled to 2-23-2015 Priority |
|---|---|

I, Jason D. Stigge, declare as follows:

# I.   INTRODUCTION

1.   I have been retained by Dewitt Law Firm, representing ProClip USA, Inc. and Brodit AB ("ProClip and Brodit"), to provide my independent expert opinion in connection with U.S. Patent No. 9,706,026 ("the '026 Patent," Ex. A).  I understand that the '026 Patent is currently assigned to National Products Inc. ("Patent Owner").

2.   I have been asked by DeWitt to offer opinions on the '026 Patent, including the invalidity of claims 1, 2, 4, 6, 10, 11, 12, 14, 15, 17, and 19 (the "Challenged Claims") in view of certain prior art.  This Declaration sets forth the opinions I have reached to date regarding these matters. I hold these opinions to a reasonable degree of professional certainty based on the materials now known to me.

3.   I am being compensated at my standard hourly consulting rate of $205 for my time spent on this matter.  My compensation is not contingent on the substance of my opinions.

4.   I have no financial interest in ProClip USA, Inc., Brodit AB, or the Patent Owner.

5.   My opinions and the bases for my opinions are set forth below.

Declaration of Jason D. Stigge

## II.   BACKGROUND AND QUALIFICATIONS

6.   I earned a B.S. degree in Mechanical Engineering in 2012, from The University of Nebraska at Lincoln.

7.   I am a licensed Professional Mechanical Engineer (Nebraska License E-16927).

8.   I am a Senior Consultant for Engineering Systems Inc. ("ESi") in the Mechanics practice.  ESi is an engineering and scientific investigation and analysis firm committed to providing clear answers to the most challenging technical problems.  At ESi, I specialize in mechanical engineering and have extensive experience with mechanical design, failure analysis, accident investigation and reconstruction, as well as laboratory physical testing.

9.   I have conducted hundreds of investigations on a wide variety of engineering structures, from miniature components of personal electronic devices to heavy earth-moving equipment.

10.   I have consulted on numerous engineering challenges, including manufacturing and manufacturability issues, analyses of materials, motion, stress and vibration analysis issues, automotive and heavy vehicle accident investigation and reconstruction, and industrial machinery failure and accident analysis.

11.   My military, academic, engineering training, professional and industry

Declaration of Jason D. Stigge

engineering experience involved significant studies and first-hand experience in mechanical engineering.

12.   I have experience in electronics, automotive, marine and rail, electrical and mechanical systems, engineering materials, as well as intellectual property disputes.  Exhibit V  lists my trial and deposition testimony from the last four years.

13.   Additional information regarding my background and qualifications, is included as part of my *curriculum vitae* ("CV"), which is provided as Exhibit W.

## III.   MATERIALS CONSIDERED

14.   In forming my opinions, in addition to my education, knowledge, and experience, I have reviewed and considered the '026 Patent and each of the documents and things listed in the List of Exhibits above and the other documents cited in my Declaration.

15.   The opinions I have set forth in this Declaration are not exhaustive of my opinions regarding the invalidity of the Challenged Claims of the '026 Patent. Thus, the fact that I do not address a particular point should not be understood to indicate that any issued claim of the '026 Patent is patentable and/or complies with the requirements of any applicable patent law, patent rule, or any other applicable statute, case law, or rule.

16.   I reserve the right to amend and supplement this Declaration in light of

additional evidence, arguments, or testimony presented during any proceeding related to the '026 Patent.

## IV.   MY UNDERSTANDING OF CERTAIN LEGAL STANDARDS

17.   I have been informed by counsel of the various legal standards that apply, some of which I discuss below, and I have applied these standards in arriving at my conclusions.

18.   I understand that for a claim to be found invalid, ProClip and Brodit must prove that the claim is invalid by a preponderance of the evidence. Nevertheless, I have applied the clear and convincing evidence for my opinions herein.

### A.   Ordinary Skill in the Art

19.   My opinions in this Declaration are based on an understanding of a person of ordinary skill in the art, which I understand is sometimes referred to by the acronym "POSA."

20.   I understand that a POSA is a hypothetical person who is presumed to be aware of the relevant information that is considered prior art at the time of invention.  By "relevant," I mean relevant to the Challenged Claims of the '026 Patent.

21.   I understand that, in assessing the level of skill of a person of ordinary skill in the art, one should consider the type of problems encountered in the art, the

solutions to those problems, the pace of innovation in the field, the sophistication of the technology, the level of education of active workers in the field, and my own experience working with those of skill in the art at the time of the invention.

### B.  Claim Construction

22.   I understand that claims, including the Challenged Claims, are generally interpreted according to their ordinary and customary meaning taking into consideration the so-called "intrinsic evidence" of the patent consisting of (1) the claim language; (2) the specification and drawings; and (3) the prosecution history. I understand that a Court has discretion to take into consideration so-called "extrinsic evidence," including references (prior art and non-prior art) as well as definitions from dictionaries and treatises.

23.   I understand that claim terms may be explicitly defined in the patent specification or they may be implicitly defined through consistent usage in the specification. I also understand that the scope of claim terms may be limited by statements in the specification or prosecution history where the application clearly disavows or disclaims subject matter in a clear and unmistakable manner.

### C.  Anticipation (35 U.S.C. § 102)

24.   I understand that a claim is invalid as anticipated if all limitations of that claim are (1) present in a single prior art device, system, or method or (2) described in a single prior art reference.

Declaration of Jason D. Stigge

25.    To anticipate the claim, the prior art does not have to use the same words as the claim, but all of the limitations of the claim must have been present or described, either expressly or inherently, as arranged in the claim.

26.    I understand that for prior art to inherently have or disclose a limitation of the claim, the prior art must necessarily include the claim limitation that is not expressly present or disclosed.  I understand that inherency may not be established by probabilities or possibilities.

## D.    Obviousness (35 U.S.C. § 103)

27.    I understand that a claim is invalid as obvious if the claimed subject matter as a whole would have been obvious to a POSA at the time the invention was made in light of the teachings of a single prior art device, system, method, or reference, or in light of a combination of prior art.

28.    I understand that obviousness is a question of law based on underlying factual issues including the level of ordinary skill in the art at the time the claimed invention was conceived and reduced to practice, the scope and content of the prior art, any differences between the prior art and the claimed invention, and any objective indicia of non-obviousness (if available), also known as "secondary considerations."

29.    I understand that the scope and content of prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed

invention.  The prior art can also come from different fields that a POSA would have considered when trying to solve the problem that is addressed by the invention.

30.   I understand that the existence of each and every limitation of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on building blocks of prior art.  But, in considering whether a claimed invention is obvious, I understand that one may find obviousness if, at the time of the patent's claimed invention, there was a reason that would have prompted a POSA to combine the known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces.

31.   I understand that in order for a claim to be rendered obvious by a combination or modification of prior art, it must be shown that a POSA would have

had a motivation to combine or modify the prior art with a reasonable expectation of success that the combination of prior art would result in the claimed invention.

32.    In assessing obviousness, I have been instructed to consider both the ordinary creativity and common sense of a POSA.  However, I also understand that it is impermissible to find obviousness based on hindsight reasoning, *i.e.*, combining prior art using the claimed invention as a template, without establishing that, as of the date of the invention, there exists a motivation to combine or an apparent reason to combine and/or modify the prior art.

33.    I understand secondary considerations include commercial success of a product due to the merits of the claimed invention, unexpected results from the claimed invention, a long-felt need that the claimed invention satisfies, failure of others to achieve the claimed invention, skepticism for the claimed invention, and copying of the claimed invention.

34.    I understand that in order for evidence of a secondary consideration to be given significant weight in an obviousness analysis, the evidence must have nexus to and be reasonably commensurate in scope with the claimed invention.

## V.    THE '026 PATENT

35.    I have reviewed the '026 Patent and understand that Jeffrey D. Carnevali is listed as the inventor.  Ex. A, p. 1.

36.    I understand that U.S. Application No. 14/936,517, which led to the

Declaration of Jason D. Stigge

'026 Patent, was filed on November 9, 2015, as a continuation-in-part of U.S. Patent Application No. 14/829,378, filed on August 18, 2015, now Pat. No. 9,602,639, which in turn is a continuation-in-part of U.S. Application No. 14/754,492, filed on June 29, 2015, now Pat. No. 9,529,387, which is a continuation-in-part of Application No. PCT/US2025/017131, filed on Feb. 23, 2015, U.S. Application No. 14/936,517, filed on Nov. 9, 2015, which is a continuation-in-part of U.S. Application No. 14/222,320, filed on Mar. 21, 2014, now Pat. No. 9,331,444. Provisional application No. 62/040,037 was filed on August 21, 2014 and provisional application No. 61/943,986 was filed on Feb 24, 2014.  Merely to be conservative, I am treating February 24, 2014 as the priority date for the Challenged Claims for the purpose of this Declaration only. As detailed further below, however, I am of the professional opinion that the asserted claims of the '026 Patent are not entitled to a filing date any earlier than November 9, 2015, the filing date of the application that matured into the '026 Patent. The invention recited in the claims of the '026 Patent is not supported by the drawings and description presented in the next-earlier application in the priority claim (U.S. Patent Application No. 14/829,378, filed August 18, 2015). The claims of the '026 Patent are thus effective only as of November 9, 2015.

37.    The '026 Patent is directed towards "[a] protective arrangement for an electronic device [that] includes a flexible cover having a panel and a skirt that form

Declaration of Jason D. Stigge

an interior cavity to receive an electronic device; and an adapter fixedly positioned in the flexible cover and having a male plug with connectors extending into the interior cavity of the flexible cover for mating with a female socket of the device and a contactor with contacts adjacent outwardly from the flexible cover and electrically coupled to one or more of the connectors of the plug. A docking cradle or external adapter can receive the electronic device and cover." Abstract, '026 Patent.

38.    Fig. 1 and Fig. 2 illustrate an example of the cover and docking cradle as shown below. I have highlighted the cover in yellow and the docking cradle in blue.



*Fig. 1*

*Fig. 2*

39.    Fig. 13 and Fig. 14 show the adapter in cross section for clarity as seen below. I have again highlighted the cover in yellow, the docking cradle in blue and

the adapter in red.



40. As will be discussed, protective arrangements such as the ones of the Accused Claims were well known in the art prior to February 24th, 2014.

**A.    Challenged Claims**

41. Of the Challenged Claims, claims 1 and 10 are independent and the remainder (2, 4, 6, 11, 12, 14, 15, 17, and 19) are dependent.

42. Claim 1 recites:

> 1. A docking cradle, comprising:
>
> a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts, the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a

docking support surface extending away from the back support surface; and

a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle, wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received.

43.    Claim 2 includes the same limitations as Claim 1, with the additional limitation "wherein the docking cradle of claim 1, wherein the rim of the female connector has an asymmetric shape." Ex. A 32:33-34

44.    Claim 4 includes the same limitations as Claim 1, with the additional limitation "wherein the rim is recessed with respect to the docking support surface." Ex. A, 32:38-39.

45.    Claim 6 includes the same limitations as Claim 1, with the additional limitation "wherein the back Support Surface and the docking Support Surface form a tray." Ex. A 32:43-44.

46.    Claim 10 recites:

Declaration of Jason D. Stigge

10. A docking system, comprising:

a protective cover for an electronic device, the cover comprising a
     shell forming an interior cavity to receive the electronic device, a
     male plug comprising a plurality of connectors extending into the
     interior cavity of the shell in an arrangement for mating with a
     female socket of the device, and a contactor comprising a plurality
     of contacts adjacent to an exterior of the shell and electrically
     coupled to one or more of the connec-tors of the plug, wherein the
     cover is configured and arranged to extend over at least a portion of
     a back surface, a front surface, and each of four side surfaces of the
     electronic device to hold the electronic device within the cover; and

a docking cradle configured to receive the cover and comprising a
     base receiver to receive the cover and a docking connector disposed
     on the base receiver and comprising a plurality of contacts
     positioned to connect with one or more of the plurality of contacts
     of the contactor of the protective cover, the docking connector
     defining a rim to guide proper mating of the contactor to the
     docking connector.

47.    Claim 11 includes the same limitations as Claim 10, with the additional
limitation that "one of the contactor and the docking connector comprises a female
portion and a different one of the contactor and the docking connector comprises a
male portion complementary to the female portion."

48.    Claim 12 includes the same limitations as Claim 10, with the additional
limitation that "the rim of the docking connector has an asymmetric shape."

Declaration of Jason D. Stigge

49.     Claim 14 includes the same limitations as Claim 10, with the additional limitation that "the base receiver of the docking cradle comprises a back support surface to support a back of the cover and electronic device and a docking support surface extending away from the back support surface."

50.     Claim 15 includes the same limitations as Claim 14, with the additional limitation that "the rim of the docking connector is recessed with respect to the docking support surface."

51.     Claim 17 includes the same limitations as Claim 14, with the additional limitation that "the back support surface and the docking support surface form a tray."

52.     Claim 19 includes the same limitations as Claim 10 with the additional limitation that "the contacts of the docking connector are biasing contacts that move when the cover and electronic device are received."

## B.     Prosecution History of the '026 Patent

53.     I have reviewed the prosecution history of the '026 Patent. Ex. B. After the '517 Application was filed on Nov. 9, 2015, the Examiner issued a Restriction/Election Requirement on June 20, 2016. (Ex. B pp. 173-179). The Patent Owner (hereinafter "PO") responded with an election in a Response to Restriction/Election Requirement filed on July 12th, 2016 that elected Species 13 corresponding to Figures 54A-54B. (Ex. B p.181-182).

54.     On September 15th, 2016, the Examiner issued a first Non-Final Office Action rejecting the independent claims (claims 1 and 10) as being anticipated under 35 U.S.C. 102(a)(1) by Braitberg (Ex. F) and Kogan (Ex. G).  (Ex. B pp.189-190). The Examiner indicated, however, that dependent claims 4 and 20 would be allowable if rewritten in independent form.  (Ex. B pp.194).  The indicated-allowable dependent claim 4 recited "wherein the female connector further comprises a magnetic coupling element resident in the connector, wherein the magnetic coupling element comprises one of a magnetic material or a magnetically attractive material." (Ex. B p.57 claim 4).  Dependent claim 20 contained similar recitations.   (Ex. B p.59 claim 20).

55.     In response, PO rewrote claim 4 in independent form, and amended claims 1 and 10, arguing that the prior art did not disclose (1) (with respect to claim 1) "the contacts of the female connector [of the docking cradle] are biasing contacts that move when the removable cover and electronic device are received," and (2) (with respect to claim 10) "a cover configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover." (Ex. B p.218-224).

56.     More specifically, the PO amended claim 1 to recite that the contacts of the connector of the cradle "are biasing contacts that move when the removable cover and electronic device are received," and also presented arguments and

assertions that such "biasing contacts" were not disclosed or suggested by any references of record.  (Ex. B, pp. 218 and 222-224).  The PO made these assertions despite PO's own contradictory admissions in three prior published applications (Carnevali 1-3): "[m]ost docking cradles either use some sort of biasing pogo pin or biasing leaf spring contact in the docking connector.  Therefore, the protective cover of the invention includes … ."  (Ex. C ¶[0009] lines 1-3; Ex. D 3:11-12; Ex. E ¶[0010] lines 1-3) (emphasis added).  This admission regarding prior art docking cradles was removed by PO, however, from the specification of the CIP application that issued as the '026 Patent (U.S. Application No. 14/936,517, filed November 9, 2015). (emphasis added)

57.   On April 4th, 2017, the Examiner issued a Final Office Action, withdrawing all prior art-based rejections, but rejecting all pending claims 1-20 as being indefinite under 35 U.S.C. 112(b) (*e.g.* antecedent basis, etc.).  (Ex. B pp.258-263).  PO's response amended claims 1 and 4 to address informalities noted by the Examiner and presented traversing remarks with respect to claim 10.  (Ex. B, pp. 272-278).   The Examiner withdrew all rejections and issued a Notice of Allowance.  (Ex. B, pp. 284-290).   Claim renumbering resulted in allowed claim 4 being renumbered as independent claim 8 of the '026 Patent.  (Ex. A, 32:48-67).

58.   152 references are cited on the face of the '026 Patent.  Ex. A, References Cited.  As noted above, however, the Examiner only used two references

to reject the Claims of the '026 Application in prosecution. *Supra* ¶ 54. The Examiner rejected Claims 1-2, 5, 10-12 and 15 under § 102 as anticipated by Braitberg (Ex. F), rejected Claims 1, 6-10, 14, and 16-19 under § 102 as anticipated by Kogan (Ex. G), and rejected Claims 3 and 13 under § 103 as obvious over Braitberg (Ex. F). No other prior art-based rejections were made during prosecution.

## VI.   PERSON OF ORDINARY SKILL IN THE ART

59.   I considered several factors to determine the skill level of a person of ordinary skill in the art of the '026 Patent at the time of the alleged invention, which I am assuming to be in or around February 2014. These include the factors listed above in paragraph 20 and my own experience working with those of skill in the art at the time of the alleged invention.

60.   Based on my knowledge, expertise, and consideration of prior art cited in the '026 Patent, it is my opinion that a POSA in the field of the '026 Patent would have had (1) a Bachelor's Degree in mechanical engineering or a related discipline and at least two years of professional experience working with electronic products and/or electrical connectors, or (2) five years or more of experience in the design or development of electronic products and/or electrical connectors.

61.   I am a person who meets the foregoing criteria for being a person of ordinary skill in the art, and thus I can testify as someone who has the knowledge of a person of ordinary skill in the art. I have also worked with others who qualify as

Declaration of Jason D. Stigge

persons of ordinary skill in the art in the field of the '026 Patent.  Unless otherwise

noted, when I state that something would be known or understood by a POSA, I am

referring to a person with this level of education and experience at the time of the

alleged invention.

## VII.   OVERVIEW OF TECHNOLOGY AND ASSERTED PRIOR ART

### A.      Overview of Braitberg.

62.     Braitberg discloses a docking cradle (400) that receives an electronic

device (200) disposed within a cover (202).  The cover includes a male connector

(322) that electrically couples the device (200) with the female connector (402) of

the docking cradle (400) as shown below:



63.     Braitberg (Ex. F) is one of the primary references cited by the examiner

in the rejection of original Claims 1 and 10 during prosecution.  To overcome this

rejection PO amended Claim 1 to include the additional limitation that "the contacts

25

of the female connector [of the docking cradle] are biasing contacts that move when the removable cover and electronic device are received" and amended Claim 10 to include the additional limitation of "a cover configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover."  As will be discussed, both of these additional limitations were well known in the art prior to February of 2014.  Furthermore, the PO admitted in published applications that "[m]ost docking cradles either use some sort of biasing pogo pin or biasing leaf spring contact in the docking connector."  (Ex. C ¶[0009] lines 1-3; Ex. D 3:11-12; Ex. E ¶[0010] lines 1-3) (emphasis added).

## B. Overview of Woud

64.    Woud discloses a docking cradle that receives an electronic device disposed within a removable cover. The removable cover encloses the electronic device. Specifically, Woud discloses a case battery system 100 which acts as a cover and includes contacts that electrically couple the device 90, such as a cell phone, to a dock 80.

65.    The '026 Patent specification only mentions the term "female connector" three times and does not use the term "male connector" at all.  It appears that the terms "male" and "female" in the '026 Patent refer to the overall shape of the connector interface, rather than the local shape immediately by the conductors

of the connector. Under this interpretation, Woud discloses a removable cover with a male connector, shown in yellow below in Figs. 18, and 19, and a female connector disposed within a docking support surface of a base receiver, shown in blue below in Figs. 18 and 19. The interface of the '026 Patent and Woud are illustrated below, and compared with Fig. 5 and 8 from the '026 Patent.

66.      Woud was not considered by the examiner during prosecution.



FIG. 18                                    FIG. 19

Declaration of Jason D. Stigge



### C.    Overview of Kogan

67.    Kogan discloses a docking cradle (10) that receives an electronic device (14) disposed within a removable cover (36).  The cover includes a male connector (44, 46, 50) that electrically couples the device (200) with a corresponding female connector (22) of the docking cradle (10) as shown below:

Declaration of Jason D. Stigge



68.     Kogan was also a primary reference cited by the examiner in the rejection of the original Claim 1 during prosecution of the '026 Patent.  To overcome this rejection PO amended Claim 1 to include the additional limitation that "the contacts of the female connector [of the docking cradle] are biasing contacts that move when the removable cover and electronic device are received" and amended Claim 10 to include the additional limitation of "a cover configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover."  As will be discussed, both of these additional limitations were well known in the prior art before February of 2014.  Furthermore, the PO admitted in published applications

that "[m]ost docking cradles either use some sort of biasing pogo pin or biasing leaf spring contact in the docking connector."  (Ex. C ¶[0009] lines 1-3; Ex. D 3:11-12; Ex. E ¶[0010] lines 1-3) (emphasis added).

### D.    Overview of Li

69.    As shown below, Li discloses a docking cradle (1) that receives an electronic device (3) disposed in a cover (21, 22) with a male connector on the cover and a female connector on the docking cradle that electrically connect the device (3) with the docking cradle (1).  The connector on the docking cradle includes spring-loaded pins (15), which are "biasing contacts that move when the removable cover and electronic device are received."  Li was not considered by the examiner during prosecution.



### E.    Overview of Rudisill

70.    As shown below, Rudisill discloses a docking station (11) that receives

Declaration of Jason D. Stigge

an electronic device (9) disposed in a cover (40).  The electrical contacts on the cover include magnets (n) that are magnetically attracted to ferromagnetic elements (109) in the contacts of the docking station (11), the resulting magnetic attraction biasing the contacts of the docking station together with the contacts of the cover.  Rudisill describes that additional "spring members 102 may be included to provide contact biasing force behind the ferromagnetic elements."  Rudisill was not considered by the examiner during prosecution.

## VIII.  SUMMARY OF MY OPINIONS

71.  Having reviewed the '026 Patent and the prior art cited above, I have formed the following opinions:

Declaration of Jason D. Stigge

- Claim terms are indefinite

  - "a male connector"

  - "a female connector"

  - "rim" and "rim to guide proper mating"

  - "the rim is recessed with respect to the docking support surface"

  - "tray"

  - "base receiver"

  - "female base receiver"

  - "a docking support surface"

  - "female portion"

  - "male portion"

- Claims 1, 2, 6, 10, 11, 12, 14, 17 and 19 are anticipated by, or, in the alternative, obvious in view of Woud;

- Claims 1 and 4 were obvious over Braitberg in view of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3;

- Claim 1 is obvious over Kogan in view of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3;

Declaration of Jason D. Stigge

- Claim 1 is obvious over Braitberg in view of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3 and in further view of Li or Rudisill;

- Claims 10, 11, 14, and 19 were obvious over Song in view of Li or Rudisill;

- Claim 15 is obvious over Song in view of knowledge of a POSA or Li or Rudisill in further view of Braitberg.

- Claims 10, 11, and 19 are anticipated by, or, in the alternative, were obvious in view of Rudisill.

The reasons for my opinions are discussed in further detail below.

## IX.   THE CLAIM TERMS "A MALE CONNECTOR" AND "A FEMALE CONNECTOR" ARE INDEFINITE AND WERE USED INCONSISTENTLY DURING PROSECUTION.

72.    As explained herein, it is my professional opinion that several terms used in the specification are incurably indefinite.  In the comments that follow, I have endeavored to identify the indefinite claim terms in the specification according to the asserted corresponding structure shown in the figures.

### A.    The Terms "A Male Connector" And "A Female Connector" Are Indefinite Based On The Specification.

73.    The term "male connector" is only mentioned in the claims of the '026 Patent and is absent from the other patents-in-suit.  Claim 1 requires "a removable cover having a male connector" and the "male connector of the removable cover."

Declaration of Jason D. Stigge

Thus, claim 1 requires that a "male connector" be a part of a "removable cover." Claim 1 also requires that the male connector includes "a plurality of contacts" to connect with the contacts of "a female connector...when the male connector is received in the base receiver."

74.    While the term "male connector" is absent from the specification, the claim term "female connector" only used twice in the specification of the '026 Patent.  A POSA would look to the "female connector" coupling to the docking cradle in order to attempt to clarify the meaning of "male connector."

75.    The term "female connector" is first used in the '026 Patent in col. 8, lines 20-2 stating "docking connector 3 may be female connector as illustrated in Figs. 3-5[.]" Ex. A, 8:20-2.  See Figs. 3-5 below:



*Fig. 3*

*Fig. 4*

*Fig. 5*

76.

77.     Further, the "female connector 3" in Figures 3-5 (shown above), includes a hole in the "docking support surface 103": of the "docking cradle 5." Ex. A, 8:1-23.  A plurality of upwardly projecting "contacts 11" extend up from the bottom of the hole of the female connector. Ex. A, 8:1-23.  The "guide pins 17" also project upwardly from the bottom of the hole. Ex. A, 8:46-26.

78.     The second use of the "female connector" in the specification of the '026 Patent is a reference to Figure 53: "the docking cradle 5 includes a docking

Declaration of Jason D. Stigge

connector 3 which, in the illustrated examples, is a female connector." Ex. A, 31:39-41.  The hole formed in "docking support surface 103" of the "docking cradle 5" and the plurality of upward facing "contacts 11" are shown in Figure 53 below:



*Fig. 53*

79.

80.    Further, the portion of the removable cover 100 that engages the female connector 3 of the docking cradle 5 is shown in the specification of the '026 Patent in Figs. 8-11.  See Figs. 8-11 below:

Declaration of Jason D. Stigge



81.

82.     It appears that the "male connector" must include the "dam 132" of the

protective cover, because the only portion of the protective cover 100 that is actually

"received in the base receiver" is the annularly-shaped "dam 132."  Further, claim 1

specifies that "when the male connector is received in the base receiver," the "male

connector" includes "contacts 122" to be engaged with the contacts 11 of the female connector 3.  Additionally, the "guide pin receivers 130" are "sized and positioned to mate with optional guide pins 17, if present" and located next to "contacts 122." Ex. A, 9:9-10.

83.    The '026 Patent states "[e]lectrical contacts 122 of contactor 120 are protected from damage by being recessed within dam 132 or otherwise within outer surface 124 of unitary protective shell 102." Ex. A, 9:17-19.   Thus, to make successful contact with the "contacts 122" of the male connector, the "contacts 11" of the "female connector 3" must project upwardly to be inserted into the recessed area defined by the "dam 132" to reach the protected contacts 122 of the male connector.

84.    The '026 Patent also states that, while some parts of the male connector, also called the dam 132, are inserted into the "female connector 3," which is going into the outer annular portion of the hole formed within the docking support surface and surrounding contacts 11, some parts of the female connector 3" are also inserted within the dam 132 of the male connector to reach contacts 122 and the "guide pin receivers 130."

85.    Therefore, based on the language in the claims, the knowledge of a POSA that a "female connector" and "male connector" couple to one another, and the description in the specification of "female connector," a "male connector" would

be understood to be an outwardly projecting annularly shaped wall defining a recess and the bottom surface of the recess containing contacts, and a "female connector" including a hole with contacts protruding from the bottom of the hole to engage with the contacts of the "male connector."

### B. The Terms "A Male Connector" And "A Female Connector" Are Used Inconsistently In Prosecution History Based On The Discussion of Braitberg.

86.     During prosecution, the examiner rejected claim 1 of the '026 Patent based on Braitberg (U.S. Pat. No. 5,535,274) (Ex. F). See Ex. B.  The rejection of claim 1 asserted the "male connector" recited in the claims was shown by the male connector, reference no. 318, to have an annular raised wall, reference no. 322, wherein the "female connector" was shown by Braitberg's female connector, noted by reference no. 402, which receives the annular raised wall (322) upon insertion.

87.     Braitberg's male connector 322 appears to be substantially similar to "dam 132" of the '026 Patent with a similarly-shaped annular wall, which extends into the hole of the female connector 402 (shown in Figs. 22-23).  Further, the contacts 208 are disposed within the raised, annular wall portion (322) and are protected from damages.  Ex. A, 9:17-19.  These same features are shown by the "male connector" in Figs. 8-11 of the '026 Patent.

88.     NPI did not dispute the Examiner's rejections, or that Braitberg displays a "male connector" and a "female connector" but rather amended the claims and

Declaration of Jason D. Stigge

included additional recitations and argued to overcome the rejections under other grounds.

89.     It is extremely difficult to determine what the terms "a male connector" and "a female connector" are because statements that the connector 402 of Braitberg is not a "female connector" but rather is a "male connector" conflict with the prosecution history.

## C.     The Discussion Of Kogan In The Prosecution History Is Inconsistent And Contradicts The "Male Connector."

90.     In prosecution, the Examiner rejected claim 1 as being anticipated by Kogan (U.S. Pat. No. 7,480,138) (Ex. G). See Ex. B.  The Examiner's rejection of claim 1 asserted that the "removable cover" including the "male connector" was shown by Kogan's cover (reference no. 36) and the male connector (reference no. 44), and that the "female connector" recited in claim 1 was shown by Kogan's female connector (reference no. 22) as further shown in Kogan Figs. 1-3.

91.     However, the "male connector" (44) of cover (36) of Kogan, has contacts projecting from the cover, as opposed to residing at the bottom of a recess. Similarly, the "female connector" includes a connector opening (22) with contacts inside as identified by the Examiner.  Additionally, the usage of "male connector" does not have an annularly shaped wall defining a recess with contacts on the bottom of the recessed surface.  The usage in Kogan only further causes inconsistencies and it cannot be reconciled by the discussion of Braitberg.  The inconsistent usage of

40

"male connector" and "female connector" causes the terms "male connector" and "female connector" to be indefinite.

### D. NPI's Use Of The Term "Male Connector" Evidences Further Indefiniteness.

92.     Definitions in technical dictionaries reflect the common understanding of technical terms to a POSA.  Extrinsic evidence further shows the use of the term "male connector" is indefinite.   Ordinary use, according to online source Technopedia, differs from the usage in the '026 Patent specification.  Technopedia defines "male connector" as "a type of connector with one or more uncovered or exposed pieces of conductor which can be inserted into a female connector to ensure a physical connector." Ex. R.  This definition states which portion will be inserted into the female connector.  However, this definition contradicts the male connector in the '026 Patent as shown in Figs. 8-11.  In the '026 Patent, the "[e]lectrical contacts 122...are protected from damage by being recessed within dam 132 or otherwise within outer surface 124 of unitary protective shell 102." Ex. A, 9:17-19. Thus, the "contacts 11" of the "female connector 3" in the '026 Patent must insert upwardly into the recessed area of the "dam 132" to reach the male connector's contacts 122.  This contradicts the definition of Technopedia.

93.     Additionally, the definition of "male connector" as provided by McGraw Hill Dictionary of Scientific and Technical Terms, Sixth Edition, states: "an electrical connector with protruding contacts for joining with a female

Declaration of Jason D. Stigge

connector." Ex. T. Similar to the Technopedia definition, McGraw Hill defines the precise contacts of the "male connector" as "protruding contacts." The McGraw Hill definition contradicts the male connector shown in the '026 Patent in Figs. 8-11. As stated above the '026 Patent defines "male connector" as "[e]lectrical contacts 122...are protected from damage by being recessed within dam 132 or otherwise within outer surface 124 of unitary protective shell 102." Ex. A, 9:17-19. The definition of the contacts in the '026 Patent as stated in col. 9, lines 17-19, refers to the "female connector 3" as having "protruding contacts" inserted upwardly into the recessed area of the "dam 132" to reach the contacts 122 of the male connector. The definition in the '026 Patent directly contradicts the McGraw Hill definition.

### E.   NPI's Use Of The Term "Female Connector" Evidences Further Indefiniteness.

94.   While intrinsic evidence already shows "female connector" is indefinite, extrinsic evidence further shows indefiniteness. The ordinary usage of "female connector" is inconsistent throughout the patents-in-suit. Ordinary use, according to online source Technopedia, differs from the usage in the '026 Patent specification. Technopedia defines "female connector" as "a female connector is a type of connector that consists of a jack into which a male connector can be inserted...A female connector has one or more holes into which a male connector can attach its exposed plug-type conductor firmly for reliable connection." Ex. S. Technopedia further states that "[w]hen the male connector has been removed, a

42

female connector's conductor is not exposed like that of a male connector, and can not come into accidental contact with objects." Ex. S.  Technopedia clearly describes the portions of the male connector that are to be inserted into the corresponding "one or more holes" of the female connector.  The Technopedia definition contradicts the definition of the '026 Patent as shown in Figures 3-5.  The "female connector 3" as shown in Figs. 3-5, the "contacts 11" of the "female connector 3" project upwardly and are inserted into the recessed portion defined by the "dam 132" to reach the contacts 122 of the male connector.

95.     Additionally, the definition provided by the McGraw Hill Dictionary of Scientific and Technical Terms, Sixth Edition, the "female connector" is defined as "a connector having one or more contacts set into recessed openings; jacks, sockets, and wall outlets are examples." Ex. U.

96.     The McGraw Hill definition of "female connector" contradicts the '026 Patent use of the term "female connector," because, as shown in Figs. 3-5 of the '026 Patent, the "contacts 11" are exposed and not "set in recessed openings" as in "jacks, sockets, and wall outlets" as stated in the McGraw Hill definition.  The use of the term "female connector" as used in the '026 Patent to refer to the connector shown in Figs. 3-5 and is inconsistent with the definition provided by McGraw Hill, thus further creating indefiniteness of the term.  Therefore, as shown above, the term "female connector" is indefinite based on intrinsic evidence.  The term "female

connector" is thus also indefinite based on extrinsic evidence as shown above and as used in the patents-in-suit.

## X.   THE CLAIM TERMS "RIM" AND "RIM TO GUIDE PROPER MATING ARE INDEFINITE.

97.    As explained herein, it is my professional opinion that several terms used in the specification are incurably indefinite.  In the comments that follow, I have endeavored to identify the indefinite claim terms in the specification according to the asserted corresponding structure in the figures.

98.    Claim 1 of the '026 Patent recites in relevant part "the female connector defining *a rim to guide proper mating* of the male connector of the removable cover to the female connector of the docking cradle[.]" Ex. A, 32:26-29 (emphasis added). Similarly, many other of the asserted claims use the terms "rim" and "rim to guide proper mating."

99.    NPI uses the term "rim" to refer to several different structures in the specification.  The specification, however, does not use the term "rim to guide proper mating."  While other structures in the specification very clearly describe the functionalities of performing guiding or mating of a structure, the various "rim" structures are not used to describe performing any guiding or mating functionalities in the specification.  Therefore, the terms "rim" and "rim to guide proper mating" are indefinite.

Declaration of Jason D. Stigge

### A.    The First "Rim" Structure of the '026 Patent.

100.   The description of Figures 3-5 of the '026 Patent use the term "rim" as "docking connector 3 may be a female connector as illustrated in Figs. 3-5 and may define a rim 105.  The rim 105 may be recessed with respect to the docking support surface 103." Ex. A, 8:20-23.

101.   The reference numeral "105" is used to refer to three different locations of the docking connector 3 in Figures 3-5.  The first reference to numeral "105" in Figure 3 appears to point to the edge that surrounds the hole in the docking support surface 103, which is the edge of the docking connector 3 where a sidewall faces inwardly meeting the docking support surface 103.  See Figure 3 below:



102.

103.   In Fig. 4, the indicating line from the reference numeral "105" appears to point to a flat surface of the sidewall facing inward on the docking connector 3. See Fig. 4 below:

Declaration of Jason D. Stigge



104.

105.   In Figure 5, the indicating line from the reference numeral "105" points to an inwardly-curved part located at the bottom of the sidewall that faces inwardly. See Fig. 5 below:



106.

107.   Further, a POSA would be unable to conclude whether the term "rim" includes one, two, or three of the above parts of the docking connector which all appear to indicate a "rim 105," without any further explanation as to what the "rim 105" is meant to mean. Based on the Figures 3-5 above, a POSA would not know whether "rim 105" is (1) the upper edge surrounding the hole, or (2) the flat part of the inwardly-facing sidewall, or (3) the inwardly-curved part at the bottom of the inwardly-facing sidewall, or (4) some combination of the three parts mentioned.

108.  The text associated with Figures 3-5 does not include any further explanation or description of the "rim 105" performing any functionality involving guiding, except the mere mention of being associated with the "guide pins 17" as such: "[d]ocking connector 3 may also include optional guide pins 17 adapted for mating with mating guide pin receivers in the contactor of the electrical adapter, as disclosed herein." Ex. A, 8:24-26.  The "guide pin receivers" are shown as holes into which the "guide pins 17" are inserted, as depicted in Figures 8-9.  Further, the term "mating" is not used in reference to the "rim 105."  Additionally, the specification states the "[c]ontactor 120 of adapter 114 is optionally formed with one or more guide pin receivers 130 sized and positioned to mate with the optional guide pins 17, if present, of docking connector 3" to describe Figure 8. Ex. A, 9:7-10.

109.  It is unclear in the specification what the "rim 105" refers to or how the "rim 105" performs any functionality such as guiding or mating.  The specification is notably silent as to the portions of the first rim structure coming into contact with the cover 100 as the cover 100 engages with the docking connector 3.  Thus, a POSA would be unable to determine with any certainty what portions of the "rim 105" perform any sort of guiding functionality.  Additionally, a POSA would determine that it is possible for the dam 132 of the cover 100 engaged with the docking connector 3 to not even make contact with the portions of the rim 105.  Thus, the term "rim to guide proper mating" is indefinite as there is no description to enable a

POSA to determine what this term means.

110.   Additionally, the '026 Patent specification states "[s]ocket receiver thus cooperates with locator dam 132 for positively positioning unitary protective shell 102 relative to docking connector 3 in receiver 9 of docking cradle 7 for promoting mating therebetween." Ex. A, 14:42-45.  This makes it clear that the relationship of the "dam 132" with the "socket receiver," which is being mentioned for the first time in col. 14, lines 42-45, is not described in the '026 Patent and a POSA is unable to decipher what the portions of the rim structure are that perform any guiding functionality.  Therefore, the term "rim to guide proper mating" is indefinite.

**B.     The Second "Rim" Structure of the '026 Patent.**

111.   Figures 24-26 of the '026 Patent describe the second rim structure "rim 164" as a planar peripheral surface that surrounds a top of a recessed socket receiver of the docking connector, wherein the planar surface is parallel with "contactor 120" disposed at the bottom of the recessed socket receiver. Ex. A, 14:59-17:7.  This is clearly a different rim structure than the first rim structure discussed above.  Further, this second rim structure is associated with numeral "164" whereas the first rim structure was associated with numeral "105" and which contained three unclear structures. See Figs. 24-26 below:

Declaration of Jason D. Stigge



112.

113.  The second rim structure is not part of the "socket receiver 166."  The '026 Patent distinguishes the "socket receiver 166" from the "rim 164" such that the "surface 156...is formed with a female nest 157 formed of a generally flat or planar peripheral surface 164 forming a support rim surrounding a shallow socket receiver 166 recessed therein." Ex. A, 15:1-4.  The specification of the '026 Patent also states that "[m]agents 178 in retention cavities 180 are retained in close proximity of

recessed floor 168 of socket receiver 166, or surrounding socket rim 164 of female nest 157." Ex. A, 16:51-54.  The "rim 164" is clearly not part of the "socket receiver 166."

114.   The specification further clarifies that he interaction of the "socket receiver" with "dam 132" performs guiding and positioning of the structures during mating.  Thus, it appears that the rim surrounds the "socket receiver 166."  Further, the "[s]ocket receiver thus cooperates with locator dam 132 for positively positioning unitary protective shell 102 relative to docking connector 3 in receiver 9 of docking cradle tray 7 for promoting mating therebetween." Ex. A, 14:42-45.  Therefore, since the "rim 164" is not part of the "socket receiver 166," but that the "socket receiver 164" interacts with the "dam 132" to position the structures, the term "rim to guide proper mating" is indefinite.

115.   Additionally, the "rotational control features 176" perform guiding functionality as part of the "socket receiver 166" and is not part of "rim 164."  Ex. A, 15:59-16:6.   The description of Figure 26 further states "[e]ngagement of cooperating peripheral transition walls 184 and 170 of projected positioning interface dam 132 and recessed socket receiver 166 operate to guide electrical contacts 122 of contactor 120 into engagement with biasing electrical contacts 11 of base receiver 9 of docking cradle 3." Ex. A, 15:59-16:6.  The "socket receiver 166" is clearly performing the desired guiding functionality.  This the "rim 164" is not

providing any guiding functionality.  It is clear from the description of Figure 26 that the "rim 164" does not even come into contact with the "cover 100" until the "dam 132" is fully disposed within the "socket receiver 166."  Therefore, the term "rim to guide proper mating" is indefinite.

### C.    The Third "Rim" Structure of the '026 Patent.

116.   The third rim structure in the '026 Patent is depicted in Figure 25 (shown above) as the "external surface 152 of flexible center panel 104 of protective shell 102 forms a lower rim of male nesting appendage 159 that engages peripheral support rim 164 of docking cradle tray 7 when complementary locator dam 132 nests in recessed socket receiver 166."  Ex. A, 15:59-16:6.  The "surface 152" is the third "rim" structure of the '026 Patent.  The third rim structure is not part of the "socket receiver 166" or the "dam 132," but rather surrounds the bottom part of the "dam 132."  This can be seen in Figure 25 above.

117.  It is clear in the specification that the interaction of the "socket receiver" and the "dam 132" is the "socket receiver" performing the guiding and positioning of the structures during mating.  The third rim structure, as previously stated, is not part of the guiding functionalities performed by the "socket receiver" and the "dam 132."  The specification is silent as to describing any guiding functionality performed by the third rim structure.  Thus, the term "rim to guide proper mating" is indefinite.

Declaration of Jason D. Stigge

### D.    The Fourth "Rim" Structure of the '026 Patent.

118.    The fourth rim structure is depicted in Figures 30-32 of the '026 Patent as associated with "cover 100" using reference numeral "164," which was also used for the second rim structure described above.  While the second rim structure using numeral "164" describes the rim as being part of the docking connector 3 of the docking cradle 5, the fourth rim structure also using numeral "164" associates the rim with the "cover 100."  Thus, the fourth rim structure is substantially similar to the second rim structure.  However, the fourth rim structure, the "rim 164" surrounds a "socket receiver 166" formed in the "cover 100."  Here, Figures 31-32 depict the "socket receiver" of the "cover 100" engaging with a "male nesting appendage 159" of the "docking cradle 5."  The guiding functionality provided by the "socket receiver 166" above is substantially the same here.  Additionally, the fourth rim structure is not part of the guiding functionality performed by "socket receiver 166." See Figs. 31-32 below:

Declaration of Jason D. Stigge



119.

120.   Thus, the fourth rim structure described in the specification does not discuss any guiding or positioning functionality performed by the "rim 164," the fourth rim structure.  The fourth rim structure is thus a planar peripheral surface that surrounds the "socket receiver 166" of "cover 100" and is parallel with the contactor surface of "socket receiver 166."   Therefore, the claim term "rim to guide proper mating" is indefinite.

**E.     The Fifth "Rim" Structure of the '026 Patent.**

121.   The fifth rim structure appears in Figure 31 (above) and is referred to by reference numeral "156" as surrounding the "male nesting appendage 159" that

projects outwardly from "docking cradle 5."  The fifth rim structure and the third rim structure are substantially similar.  However, the rim "156" surrounds the "male nesting appendage 159" as opposed to "dam 132" formed on the "cover 100."  Further, as depicted in Figure 32 above, the "male nesting appendage 159" of the "docking cradle 5" engages with the "socket receiver 166" of the "cover 100."  The fifth rim structure is not part of the "male nesting appendage 159" or the "socket receiver 166" which performs the guiding and positioning functionality, as described above.

122.  The fifth rim structure is clearly a planar peripheral surface surrounding the "male nesting appendage 159" of the "docking cradle 5," but parallel to the contactor surface of the "male nesting appendage 159."  The specification does not describe any guiding functionality performed by the fifth rim structure.  Thus, the term "rim to guide proper mating" is indefinite.

**F.  The Sixth "Rim" Structure of the '026 Patent.**

123.  The sixth rim structure is depicted in Figure 53 of the '026 Patent as "rim 105" being the edge of the intersection of a curved surface extending into the docking connector 3 and a flat sidewall surface extending downwardly into a recess of docking connector 3 toward the contactor.  The specification does not give further detail of the term "recessed," but it appears that "rim 105" is not co-planar with docking support surface 103 and is disposed downwardly into the hole of docking

support surface 103.  See Figure 53 below:



124.

*Fig. 53*

125.   The sixth rim structure of Figure 53 describes the "rim 105" as being "recessed" and "asymmetric" with an "elongated D-shape...a straight side and a curved side opposite the straight side."  Ex. A, 31:50-51.  The asymmetric shape of "rim 105" "may facilitate proper alignment when the cover is mated with the docking cradle." Ex. A, 31: 51-51.

126.   While the sixth rim structure may show some guiding and positioning functionality, it still remains unclear.  The reference numeral "105" was also used in Figures 3-5 in reference to three different parts of the docking connector 3.  The "rim 105" described as "recessed" and "asymmetric" may describe the guiding functionality, however, it does not add clarity to the other five rim structures discussed above.  Therefore, the term "rim to guide proper mating" remains indefinite as it is still unclear whether the "rim to guide proper mating" must also be

"recessed" and "asymmetric" as in Figure 53.

### G.   Summary Of Indefiniteness Of "Rim" And "Rim To Guide Proper Mating."

127.   The specification is inconsistent in the descriptions of the term "rim" and "rim to guide proper mating" and thus the terms are indefinite.  A POSA would be unable to determine which structure the terms "rim" and "rim to guide proper mating" are referring to based on the description included in the specification.  The first rim structure indicates various points on the docking connector 3, and it is impossible for a POSA to determine which point the "rim" is referring to.  Further, the specification does not describe any guiding or positioning functionality for the first rim structure.  Thus the "rim" and "rim to guide proper mating" are indefinite.

128.   The second, third, fourth, and fifth rim structures do not contain any description of guiding functionality in the specification.  Additionally, the second through fifth rim structures are described to be separate from the "socket receiver," which is the component described to have guiding or positioning functionality.  Thus, the terms "rim" and "rim to guide proper mating" are indefinite.

129.   Lastly, the sixth rim structure is described to be "recessed" and "asymmetric" which arguable does have some guiding functionality.  However, the term "rim" and "rim to guide proper mating" are still indefinite, because they are not further clarified by the first through fifth rim structures.  Therefore, "rim" and "rim to guide proper mating" are clearly indefinite.

Declaration of Jason D. Stigge

130.   Even if "rim and "rim to guide proper mating" are not indefinite, their meaning should be clearly defined in the specification such that a POSA could understand with reasonable certainty.  Here, a POSA is unable to understand with reasonable certainty what the terms "rim" and "rim to guide proper mating" mean.

## XI.   THE TERMS "TRAY" AND "BASE RECEIVER" ARE NOT DEFINED IN THE SPECIFICATION AND ARE USED INCONSISTENTLY THROUGHOUT THE SPECIFICATION, RESULTING IN INDEFINITENESS.

131.   As explained herein, it is my professional opinion that several terms used in the specification are incurably indefinite.  In the comments that follow, I have endeavored to identify the indefinite claim terms in the specification according to the asserted corresponding structure shown in the figures.  The terms "tray" and "base receiver" are not defined in the specification and are used inconsistently throughout the specification.  Thus, the terms are indefinite.

132.   The specification describes a "tray" three different ways.  The first "tray" is described in relation to the "docking cradle 5" and the "cover 100."  The specification states the "docking cradle 5 has a tray with a base receiver sized to receive a specific smartphone, tablet, or other portable electronic device."  Ex. A, 8:3-9.  It goes on to say that "[t]he tray 7 includes a back support surface 101 to support the back of the cover 100 and a docking support surface 103 extending away from the back support surface."  Ex. A, 8:3-9.  Further, "[d]ocking connector 3 is provided in the docking cradle 5, often in the middle of the base receiver 9 of tray

Declaration of Jason D. Stigge

7." Ex. A, 8:12-13.  See Figs. 3-4 below:



133.

134.   The "tray 7" in the specification includes both a "back support surface 101" and a "docking support surface 103" and that a portion of the "tray 7" is called a "base receiver 9."

135.   The second "tray" structure is discussed in the description of Fig. 24 as "a tray 7 is configured to lie substantially horizontally with base receiver 9 configured having an upper operational surface 156 and a lower interface surface 158 spaced apart by a peripheral side wall." Ex. A, 14:59-67.  Further, "tray 7 may be structured with a generally round shape, but any generally square or rectangular, oval, kidney, or other regular or irregular shapes as are suitable in an equivalent structure." Ex. A, 14:59-67.  Additionally, an "[o]perational surface 156 of docking cradle tray 7 is formed with a female nest 157 is formed of a generally flat or planar

peripheral surface 164 forming a support rim surrounding a shallow socket receiver 166 recessed therein." Ex. A, 15:1-9.  The "shell 102 of protective cover 100 is retained in tray 7 of docking cradle 5 under the weight of portable electronic device 1 in shell 102." Ex. A, 16:7-13.  See Fig. 24 below:



136.

137.   The second "tray 7" includes the "base receiver 9" having a "female nest 157" or a "socket receiver 166," however the specification is silent as to the "tray 7" having a "back support surface 101" and a "docking support surface 103."

138.   The third "tray" structure, shown in Figures 30-32 is described as the "female nest 157 bring provided on a protective shell 102 by locator dam 132 which is configured here with shallow socket receiver 166 from docking cradle tray 7." Ex. A, 20:22-36.  Further, "the positioning interface feature provided between contactor 120 of converting adapter 114 and docking connector 3 formed by male nesting appendage 159 and mating female nest 157 of docking cradle tray is inverted." Ex. A, 20:9-21.  Additionally, the "female nest 157 is seated over complementary male nesting appendage 159 of docking cradle tray 7.  Operational surface 156 of tray 7

Declaration of Jason D. Stigge

is configured with complementary male nesting appendage 159 from protective cover 100." Ex. A, 20:37-50.  Also, the tray is described as "tray 7 of docking cradle 5 being configured to lie substantially horizontally with base receiver 9 configured having its upper operational surface 156 formed of a generally flat plane." Ex. A, See Figs. 30-32 below:



139.

140.  Therefore, the specification does not describe the "tray 7" to include

the "docking support surface 103," "back support surface 101," "female docking connector 3," "female nest 157," or "socket receiver 166" as required by the previous tray structures.  The third tray structure includes a "male nesting appendage 159" that engages to "socket receiver 166" or "female positioning interface 132" of the "cover 100" which was not required by the previous tray structures.

141.   Thus, the term "tray" and "base receiver" are indefinite because a POSA would not understand what the terms mean based on the description provided in the specification.  Therefore, the terms "tray" and "base receiver" are indefinite.

## XII.   "DOCKING SUPPORT SURFACE," "FEMALE PORTION" AND "MALE PORTION" SHOULD BE DETERMINED FROM THE SPECIFICATION.

142.   As explained herein, it is my professional opinion that several terms used in the specification are incurably indefinite.  In the comments that follow, I have endeavored to identify the claim terms in the specification according to the asserted corresponding structure shown in the figures.

### A.   "Docking Support Surface."

143.   The term "docking support surface" is used when describing the tray such that "[t]he tray 7 includes a back support surface 101 to support a back of the cover 100 and a docking support surface 103 extending away from the back support surface.  The back support surface 101 and the docking support surface 103 may form an angle in the range of 90 to 130 degrees or more." Ex. A, 8:3-9.  Additionally,

"[t]he rim 105 may be recessed with respect to the docking support surface 103."

Ex. A, 8:12-23.  Further, the "docking support surface 103" is described in the

specification as "a docking support surface 103 extending from the back support

surface." Ex. A, 31:28-38.  Wherein "the back support surface 101 and the docking

support surface 103 form an angle in a range of 90 to 130 or a range of 90 to 120

degrees or a range of 90 to 100 degrees or equal to 90 degrees." Ex. A, 31:28-38.

See Fig. 53 below:



144.                         *Fig. 53*

145.   The  docking  support  surface  103"  is  further  described  in  the

specification: "FIGS. 54A-54B illustrate another docking cradle 3 with multiple

back support surfaces 101 and a docking connector 3 with one or more docking

support surfaces 103 formed in a housing."  Ex. A, 31:54-57.  The term "docking

support surface" as understood by a POSA would be a structure that is configured

for docking with a flexible protective "cover" and disposed on an electronic device

Declaration of Jason D. Stigge

and configured for supporting the weight of both an "electronic device" and a "cover."

### B.   "Female Portion" And "Male Portion."

146.   The "female portion" and "male portion" are not defined anywhere in the specification of any patents-in-suit.   The terms "female receptacle," "female portion" and "male portion" appear in claim 11 as "the docking connector comprises a *female portion* and a different one of the contactor and the docking connector comprises a *male portion* complementary to the *female portion*." Ex. A, Claim 11, 33:26-30.   However, it is clear from the specification that the portions of the '026 Patent is where the "docking connector 3" includes "guide pins 17" inserted into the "guide pin receivers 130" of "contactor 120.) Ex. A, Figs. 3-5 and 8-11.

147.   Thus, because of the lack of description in the specification, the terms "female portion" and "male portion" are unclear and indefinite.

## XIII.   THE CHALLENGED CLAIMS ARE INVALID

### A.   Ground 1: Claims 1, 2, 6, 10, 11, 12, 14, 17 and 19 are Anticipated by, or Rendered Obvious in View of Woud

#### 1.   *Claim 1*

148. Claim 1 of the '026 Patent recites the following:

> 1. A docking cradle, comprising:
>
> a  base  receiver  configured  to  receive  an  electronic
> device disposed in a removable cover having a male
> connector  with  a  plurality  of  contacts,  the  base

receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface; and

a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle, wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received.

149.   It is my opinion that Woud anticipates Claim 1 because each element of Claim 1 of the '026 Patent was present in Woud.

### a)      A docking cradle, comprising:

150.   I have been informed that a preamble is generally not a patentably distinct limitation of a claim, especially where that preamble does not recite a limitation of the claim, and where it is not referred to in the body of the claim, as is the case here.  However, to the extent the preamble is a limitation of the claim, it is my opinion that this limitation was present in the Woud.

151.   The preamble of claim 1 recites a docking cradle. Woud discloses a

Declaration of Jason D. Stigge

docking cradle. In the summary of the invention, Woud states that "[a]n objective of the invention is to provide a case battery system for a personal electronic device." Ex. N, 1:52-53. "The case battery system includes a case battery, a connector adaptor, and a dock." Id., 1:53-55. The dock 80 described in Woud is a docking cradle.

> **b)**      **a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts**

152.  Woud discloses these elements. The detailed description of Woud references Figures 1-20 illustrating "a case battery 100 installed on a personal electronic device 90, a connector adaptor 60, and the dock 80 according to the embodiments of the present invention." Ex. N 5:18-20. Further, Woud states "the dock 80 may be configured to accept the bottom holding portion 10 even when the case battery 100 is enclosing the personal electronic device 90 and provides access to external electrical power to charge the charging portion 40 and access to information to communicate between the dock 80, the personal electronic device 90 and an external device (not shown)." Ex. N. 7:8-14. "The case battery 100 includes a bottom holding portion 10, a rear plate portion 20, a top holding portion 30." Ex. N, 5:25-26. As clearly described, the case 100 is a removable cover that can be removably positioned around an electronic device, such as a phone.

153.  The dock of Woud includes a base receiver that is configured to receive

an electronic device in a removable cover.

154.   "The bottom holding portion 10 is configured to hold a lower part of the personal electronic device 90 and provide a plurality of external interfacing devices with access to the personal electronic device 90." Ex. N, 5:30-33. "The spring connector 84 may be configured to connect the connector receptacle 18 of the bottom holding portion 10 when the bottom holding portion 10 is disposed at the bottom of the holding cup." Ex. N 7:19-22. The bottom holding portion 10 has a male connector that is a mating structure defining a protrusion that supports and positions contacts 18 to ensure a connection with the contacts 84 on the dock 80, shown in Fig. 18 of Woud, copied below. Fig. 7 of Woud illustrates a plurality of contacts for the connector receptacle plates 18.

155.   The removable case battery of Woud includes a male connector with a plurality of contacts.

Declaration of Jason D. Stigge



FIG. 18

FIG. 7

c)  **the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface**

156.  Woud discloses these elements. The detailed description of Woud states "the dock 80 may include a holding cup 82, a spring connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Woud states that "[t]he holding cup may be

67

configured to accept and engage at least part of the bottom holding portion." Id., 3:10-11. As Fig. 15 and Fig. 19 below illustrate, the holding cup 82 has a back support surface (highlighted green) which supports the rear plate portion 20 of the removable case battery 100, and a docking support surface (highlighted blue) which receives and supports the bottom holding portion 10 of the removable case battery 100, and which extends away from the back support surface.

157.    The dock of Woud comprises a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface.



FIG. 19                                            FIG. 15

Declaration of Jason D. Stigge

d)     a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver

158.   Woud discloses these elements. The Summary of Woud states "The dock may include a holding cup, a plurality of spring connectors" Ex. N 3:4-5. The holding cup may be configured to accept and engage at least a part of the bottom holding portion. Ex. N 3:10-11. Fig. 19 shows that the docking support surface has a female connector that is a mating structure defining a recess that supports and positions contacts 84 to ensure a connection with the contacts 18 on the bottom holding portion 10.

159.   The female connector portion of the holding cup 82 also includes "a spring connector 84." Ex. N, 7:15-18. As shown below in Fig. 15, Woud's dock spring connector 84 has a plurality of contacts.  Ex. N Fig. 15.

160.   "The spring connector 84 may be configured to connect to the connector receptacle 18 of the bottom holding portion 10 when the bottom holding portion 10 is disposed at the bottom of the holding cup 82." Ex. N 7:19-22. The plurality of contacts of the spring connector 84, shown below in Fig. 15, is configured to connect with one of more of the plurality of contacts 18 of the male connector when the male connector is received into the dock 80.

Declaration of Jason D. Stigge



FIG. 19                                    FIG. 15

161.   The dock of Woud comprises a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver.

      e)     **the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle**

162.   Woud discloses this element. As previously discussed, the docking support surface of Woud includes a female connector. As can be seen below in the highlighted Fig. 15 and Fig. 18, the female connector defines a rim (blue with crosshatch added). The rim guides the male connector of the removable case battery's bottom holding portion 10 (highlighted yellow) to the female connector of the dock (highlighted blue) and ensures proper mating between the two.

163.   The dock of Woud includes a female connector (blue) which defines a

70

Declaration of Jason D. Stigge

rim to guide proper mating of the male connector (yellow) of the removable cover

to the female connector of the docking cradle.



FIG. 15

FIG. 18

**f)    wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received**

164.  Woud discloses this element.

165.  Woud states, "dock 80 may include a holding cup 82, a spring

connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector

receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Woud discloses that

these spring connector 84 contacts are designed "to connect the connector receptacle

18 of the bottom holding portion 10 when the bottom holding portion 10 is disposed

at the bottom of the holding cup 82." Ex. N, 7:19-22. Fig. 19 illustrates the

Declaration of Jason D. Stigge

removable case battery and electronic device as received into the dock of Woud.



FIG. 19

166.    Being a spring connector, component 84 is designed to move when the connection is made. As shown in Figure 15 below, the spring connector 84 includes multiple contacts. Therefore, the spring connector 84 must include multiple biasing contacts.

167.    The spring connectors 84 of Woud comprise contacts of the female connector that are biasing contacts that move when the removable cover and electronic device are received.

Declaration of Jason D. Stigge



FIG. 15

168.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 1 of the '026 Patent under 35 U.S.C. ¶102.

> *2.    Claim 2*

169.   Claim 2 of the '026 Patent recites the following:

> 2. The docking cradle of Claim 1, wherein the rim of
> the female connector has an asymmetric shape.

170.   Woud discloses the elements of Claim 2. As explained above, Woud discloses all the elements of Claim 1.

171.   Woud Fig. 15 is below, with the female connector portion highlighted yellow, and the female connector portion rim being hatched. A horizontal mid-line

Declaration of Jason D. Stigge

was added across the female connector portion. As can be seen, the rim of the female

connector portion is asymmetric about a horizontal mid-line.

172.   This arrangement facilitates proper alignment of the case battery 100

and the personal electronic device 90 within with the dock 80.



FIG. 15

173.   Therefore, it is my opinion that Woud discloses all the elements of and

anticipates Claim 2 of the '026 Patent under 35 U.S.C. ¶102.

> *3.    Claim 6*

174.   Claim 6 of the '026 Patent recites the following:

> 6. The docking cradle of Claim 1, wherein the back
> support surface and the docking support surface
> form a tray.

175.   Woud discloses the elements of Claim 6. As explained above, Woud

discloses all the elements of Claim 1.

176.   The detailed description of Woud states "the dock 80 may include a holding cup 82, a spring connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Woud states that "[t]he holding cup may be configured to accept and engage at least part of the bottom holding portion." Id., 3:10-11. The holding cup 82 has a back support surface which supports the rear plate portion 20 of the removable case battery 100, and a docking support surface which receives and supports the bottom holding portion 10 of the removable case battery 100, and which extends away from the back support surface. The plain and ordinary meaning of "tray" would had been understood by a person of ordinary skill as an open receptacle to hold, carry, or display the electronic device. In combination, the docking support surface and the back support surface form the tray that is designed to hold and display the electronic device 90 while within the removable case battery 100.

177.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 6 of the '026 Patent under 35 U.S.C. ¶102.

### 4.    *Claim 10*

178.   Claim 10 of the '026 Patent recites the following:

> 10.  A docking system, comprising:
> a protective cover for an electronic device (Ex. A Fig. 1 ref 1), the cover comprising a shell forming an interior cavity to receive the electronic device, a

male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug, wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover; and

a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover, the docking connector defining a rim to guide proper mating of the contactor to the docking connector.

179.   It is my opinion that Woud anticipates Claim 10 because each element of Claim 10 of the '026 Patent is present in Woud.

### a)   "A docking system, comprising"

180.   I have been informed that a preamble is generally not a patentably distinct limitation of a claim, especially where that preamble does not recite a limitation of the claim, and where it is not referred to in the body of the claim, as is

the case here.  However, to the extent the preamble is a limitation of the claim, it is my opinion that this limitation was present in the Woud.

181.   The preamble of claim 1 recites a docking system.  Woud discloses "a docking system."  In the summary of the invention, Woud states that "[a]n objective of the invention is to provide a case battery system for a personal electronic device." Ex. N, 1:52-53. "The case battery system includes a case battery, a connector adaptor, and a dock." Id., 1:53-55. The case battery and dock described in Woud is a docking system.

     **b)** **"a protective cover for an electronic device, the cover comprising a shell forming an interior cavity to receive the electronic device"**

182.   Woud disclosed this element as "[a]n aspect of the invention provides a case battery system for a personal electronic device 90." Ex. N, 5:21-22. Woud's case battery 100 is a protective cover as can be seen in Woud Fig. 2, 8 and 12 below.

183.   "The case battery 100 includes a bottom holding portion 10, a rear plate portion 20, a top holding portion 30" which comprises a shell and forms and interior cavity to receive the electronic device.

184.   Collectively, the top holding portion 30, rear plate portion 20, and bottom holding portion 10 are a removable protective cover that comprise a shell with an interior cavity where the electronic device 90 is received.

Declaration of Jason D. Stigge



c)    **"a male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug"**

185.   Woud disclosed this element.  Woud states "The first connector 12 may be configured to electrically connect the case battery 100 to the personal electronic device 90 including electrical power and communication signals." Id., 6:13-15.

186.   As can be seen in Fig. 2 and Fig. 19 shown below, the male connector 12 (red) comprises a plurality of connectors extending into the interior cavity of the case battery 100 shell to mate with the female socket of the device 90.

187.    Likewise, as shown in Fig. 7, the connector receptacle 18 is located

Declaration of Jason D. Stigge

adjacent to the exterior of the case battery 100, has a plurality of contacts adjacent to the exterior bottom holding portion 10, and is designed to be electrically connected to one or more of the connectors of the connector plug 12.



FIG. 2

FIG. 19

Declaration of Jason D. Stigge



FIG. 7

d) **wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover**

188.   Woud disclosed this element. Woud states that the case battery system provides protection of a personal electronic device.

189.   Woud states "The bottom holding portion is configured to hold the lower part of the personal electronic device and provide a plurality of external interfacing devices with access to the personal electronic device. The rear plate portion is configured to be attached to or detached from the bottom holding portion

mechanically and electrically and protect the rear portion of the personal electronic device. The top holding portion is configured to hold the top part of 10 the personal electronic device and provide access holes to at least part of the input and output devices of the personal electronic device." Id., 2:1-12

190.   Figures 2, 8, and 12 of Woud show that the top portion 30, bottom portion 10, and rear plate portion 20 combine and extend over at least a portion of the sides, back, front, and top of an electronic device 90.

191.   Woud's case battery cover 100 extends over at least a portion of the back, front, and each of the four side surfaces of an electronic device 90 to hold the device within the cover.



Declaration of Jason D. Stigge

> **e)   a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover**

192.   Woud disclosed this element. Woud states that "the dock 80 may be configured to accept the bottom holding portion 10 even when the case battery 100 is enclosing the personal electronic device 90 and provide access to external electrical power to charge the charging portion 40 and access to information to communicate between the dock 80, the personal electronic device 90, and an external device." Ex. N, 7:8-14.

193.   Woud states "[i]n certain embodiments shown in Figs. 15-20, the dock 80 may include a holding cup, a spring connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Figures 15 and 19 clearly illustrate the docking connector's spring connector 84 has a plurality of contacts "configured to connect the connector receptacle 18 of the bottom holding portion 10 when the bottom holding portion 10 is disposed at the bottom of the holding cup 82." Ex. N, 7:19-22.

194.   As outlined above, Woud's connector receptacle plate 18 is the contactor recited by claim 10 of the '026 Patent.

195.   Accordingly, Woud's docking system has a docking cradle comprising a base receiver to receive the cover and a docking connector in the base receiver

comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover.

> **f)**     **"the docking connector defining a rim to guide proper mating of the contactor to the docking connector"**

196.   Woud disclosed this element. The docking connector defines a rim that is apparent from Figures 15, 18, and 19 in Woud. This rim serves to guide and ensure proper mating between the male contactor portion (highlighted blue above) of the protective cover's bottom holding 92 portion 10 and the female connector portion of the docking support surface.

197.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 10 under 35 U.S.C. ¶102.

> *5.     Claim 11*

198.   Claim 11 of the '026 Patent recites the following:

> 11. The docking cradle of claim 10, wherein one of the contactor and the docking connector comprises a female portion and a different one of the contactor and the docking connector comprises a male portion complementary to the female portion.

199.   Woud discloses the elements of Claim 11. As explained above, Woud discloses all of the elements of Claim 10.

200.   Woud's summary states that docking system's "holding cup may be configured to accept and engage at least part of the bottom holding portion." Ex. N,

Declaration of Jason D. Stigge

3:10-11. Fig. 15 below shows that Woud's holding cup 82 includes a female portion (highlighted in blue) within the docking system. The female portion of the holding cup 82 is recessed and is designed to receive the male connector on the removable case battery cover 100. In this way, the female docking connector complements the male connector of the case battery cover 100.

201.   Woud's dock has a recessed female portion structure and the contactor has a male portion structure to mate the case with the dock complementary to the female portion.



FIG. 19

202.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 11 of the '026 Patent under 35 U.S.C. ¶102.

6.     *Claim 12*

203.   Claim 12 of the '026 Patent recites the following:

> 12. The docking system of Claim 10, wherein the rim
> of the docking connector has an asymmetric shape.

204.   Woud discloses the elements of Claim 12. As explained above, Woud

discloses all the elements of Claim 10.

205.   Woud Fig. 15 is below, with the female connector portion highlighted

blue, and the female connector portion rim being hatched. A horizontal mid-line was

added across the female connector portion. As can be seen, the rim of the female

connector portion is asymmetric about a horizontal mid-line.

206.   This arrangement facilitates proper alignment of the case battery 100

and the personal electronic device 90 within with the dock 80.



FIG. 15

207.   Therefore, it is my opinion that Woud discloses all the elements of and

Declaration of Jason D. Stigge

anticipates Claim 12 of the '026 Patent under 35 U.S.C. ¶102.

>    7.    *Claim 14*

208.   Claim 14 of the '026 Patent recites the following:

> 14. The docking system of Claim 10, wherein the base receiver of the docking cradle comprises a back support surface to support a back of the cover and electronic device and a docking support surface extending away from the back support surface.

209.   Woud discloses these elements. The detailed description of Woud states, "the dock 80 may include a holding cup 82, a spring connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Woud states that "[t]he holding cup may be configured to accept and engage at least part of the bottom holding portion." Id., 3:10-11. As Fig. 15 and Fig. 19 below illustrate, the holding cup 82 has a back support surface (highlighted green) which supports the rear plate portion 20 of the removable case battery 100, and a docking support surface (highlighted blue) which receives and supports the bottom holding portion 10 of the removable case battery 100, and which extends away from the back support surface.

210.   The dock of Woud is a base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface.

Declaration of Jason D. Stigge



FIG. 19                    FIG. 15

211.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 14 of the '026 Patent under 35 U.S.C. ¶102.

    8.   *Claim 17*

212.   Claim 17 of the '026 Patent recites the following:

> 17. The docking system of Claim 14, wherein the back support surface and the docking support surface form a tray.

213.   Woud discloses the elements of Claim 17. As explained above, Woud discloses all of the elements of Claim 14 and Claim 10.

214.   The detailed description of Woud states, "the dock 80 may include a holding cup 82, a spring connector 84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-

Declaration of Jason D. Stigge

18. Woud states that "[t]he holding cup may be configured to accept and engage at least part of the bottom holding portion." Id., 3:10-11. The holding cup 82 has a back support surface which supports the rear plate portion 20 of the removable case battery 100, and a docking support surface which receives and supports the bottom holding portion 10 of the removable case battery 100, and which extends away from the back support surface. The plain and ordinary meaning of "tray" would had been understood by a person of ordinary skill as an open receptacle to hold, carry, or display the electronic device. In combination, the docking support surface and the back support surface form the tray that is designed to hold and display the electronic device 90 while within the removable case battery 100.

215.   Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 17 of the '026 Patent under 35 U.S.C. ¶102.

9.   *Claim 19*

216.   Claim 19 of the '026 Patent recites the following:

19. The docking system of Claim 10, wherein the contacts of the docking connector are biasing contacts that move when the cover and electronic device are received.

217.   Woud discloses the elements of Claim 19. As explained above, Woud discloses all the elements of Claim 10.

218.   Woud states "dock 80 may include a holding cup 82, a spring connector

88

84, a plurality of locks 81, a release button 83, a multi-purpose connector receptacle 86, and a charging indicator 88." Ex. N, 7:15-18. Woud discloses that these spring connector 84 contacts are designed "to connect the connector receptacle 18 of the bottom holding portion 10 when the bottom holding portion 10 is disposed at the bottom of the holding cup 82." Ex. N, 7:19-22. Fig. 19 illustrates the removable case battery and electronic device as received into the dock of Woud.



FIG. 19

219.   Being a spring connector, component 84 is designed to move when the connection is made. As shown in Figure 15 below, the spring connector 84 includes multiple contacts. Therefore, the spring connector 84 must include multiple biasing contacts.

Declaration of Jason D. Stigge



FIG. 15

220.   A person of ordinary skill in the art would appreciate that the use of a spring connector 84 that connects to the connector receptacle 18 of the bottom holding portion 10 of the removable cover 100 requires a mating relationship between the spring connector 84 contacts and connector receptacle 18 contacts. Further, a person of ordinary skill in the art would know that such a relationship would result in the movement of the spring connector 84 contacts when mated with the connector receptacle 18 contacts. The contacts with the spring connector constitute a biasing contact.

221.   The spring connectors 84 of Woud comprise contacts of the female

Declaration of Jason D. Stigge

connector that are biasing contacts that move when the removable cover and electronic device are received.

222.    Therefore, it is my opinion that Woud discloses all the elements of and anticipates Claim 19 of the '026 Patent under 35 U.S.C. ¶102.

223.    Insofar as Woud anticipates claims 1, 2, 6, 10, 11, 12, 14, 17 and 19 of the '026 Patent, Woud also renders these claims obvious to a POSA. That is, to the extent there are any differences, real or perceived, between the device disclosed by Woud and the device recited in claims 1, 2, 6, 10, 11, 12, 14, 17 and 19 of the '026 Patent, these differences would be obvious to a POSA.

**B.     Ground 2: Claims 1 and 4 are unpatentable because they were obvious over Braitberg in view of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3**

224.    For the reasons I set forth below, in my opinion, claim 1 and claim 4 of the '026 Patent were obvious over Braitberg in light of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3.

*1.     Claim 1*

225.    Claim 1 of the '026 Patent recites the following limitations:

1.  1. A docking cradle, comprising:

a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts, the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a

Declaration of Jason D. Stigge

docking support surface extending away from the back support surface; and

a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle, wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received.

226.   Claim 4 includes the same limitations as Claim 1, with the additional limitation that "the rim is recessed with respect to the docking support surface."  Ex. A, 32:38-39.

227.   It is my opinion that each element of Claim 1 and Claim 4 of the '026 Patent was present in the combination of Braitberg and the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3, as explained below.

### a)   "A docking cradle comprising"

228.   I have been informed that a preamble is generally not a patentably distinct limitation of a claim, especially where that preamble does not recite a limitation of the claim, and where it is not referred to in the body of the claim, as is the case here.  However, to the extent the preamble is a limitation of the claim, it is my opinion that this limitation was present in the Braitberg.

Declaration of Jason D. Stigge

229.   Braitberg discloses a docking cradle (400), as shown in Fig. 22 and Fig. 23 of Braitberg below.



b)   "a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts"

230.   The limitation "a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts" was disclosed in Braitberg.  As can be seen in Fig. 17, Fig. 22, and Fig. 23 above, the base receiver 400 is configured to receive an electronic device (200) disposed in a removable cover (202) having a male connector (322) with a plurality of contacts (325).   As explained in Braitberg, "[t]he connector housing 320 has a number of conductor contacts 325 (Fig. 17), which may be a variety of connectors, including, for example, spring contacts and fixed connectors."  Braitberg, 12:14-17.

>   c)   **"the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface"**

231.   The limitation "the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface" was disclosed in Braitberg. As can be seen in Fig. 22 above, the base receiver (400) has a back support surface (410) that supports the back of the removable cover (202) and electronic device (200).  Likewise, the base receiver has a docking support surface extending away from the back support surface. I have highlighted the back support surface green and the docking support surface blue below in Fig. 22 and Fig. 23 of Braitberg.



Declaration of Jason D. Stigge

     **d)**    **"a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle"**

232.   The docking support surface of the base receiver (400) is highlighted in Fig. 22 and Fig. 23 below.



FIG. 22          FIG. 23

FIG. 17

As can be seen, the female connector (402) is disposed within the docking support surface of the base receiver.  The female connector (402) has a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, as can be seen in Fig. 22 and Fig. 23.   As explained in Braitberg, "[b]ase unit 400 includes connector 402 which is configured to mate with outlet 322 of a pocket adapter 202." Braitberg 15:44-45.  A POSA would understand 402 to contain multiple contacts

Declaration of Jason D. Stigge

that are configured to connect with the contacts of the male connector, such as shown in Fig. 13.

233. As can be seen in Fig. 22 of Braitberg, when the male connector is received in the base receiver, the female connector defines a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle.  The rim is highlighted in red in Fig. 22 below.



FIG. 22

e)      **"wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received"**

234.   Braitberg discusses the use of "miniature leaf springs which provide

pressure with the contacts of the mating connector." Braitberg 7:7-8. Similarly, Bratberg explains that "[t]he connector housing 320 has a number of conductor contacts 325 (Fig. 17), which may be a variety of connectors, including, for example, spring contacts and fixed connectors.

235.   The three published applications owned by PO (Carnevali 1-3) each expressly admit that: "Most docking cradles either use some sort of biasing pogo pin or biasing leaf spring contact in the docking connector.  Therefore, the protective cover of the invention includes … "  (Ex. C, para. [0009], lines 1-3; Ex. D, p. 3, lines11-12; Ex. E, para. [0010], lines 1-3) (emphasis added).  This admission was removed by PO from the specification of the CIP application that issued as the '026 Patent.  Nevertheless, biasing contacts were known, both in Braitberg as well as by a POSA as commonplace.  The published applications owned by PO (Carnevali 1-3) admit as much.

236.   To the extent that Braitberg does not expressly show the biasing contacts in Fig. 22, it would have been obvious to incorporate biasing contacts that move when the connector is engaged.  A POSA would have been motivated to use the spring-loaded pins in the device of Braitberg because spring-loaded pins provide a highly-reliable electrical connection with greater durability and resistance to mechanical shock and vibration.  Spring-loaded connectors were the typical connector used in base units (battery/charger) for portable equipment such as mobile

phones/radios, barcode readers, medical and other test instruments well prior to February of 2014.

237.   Therefore, claim 1 is unpatentable because it is obvious over Braitberg (Ex. F) in view of the knowledge of a POSA or of Carnevali 1 (Ex. C), Carnevali 2 (Ex. D), or Carnevali 3 (Ex. E).

### 2.   *Claim 4*

238.   Claim 4 of the '026 Patent recites the following limitations: "The docking cradle of claim 1, wherein the rim is recessed with respect to the docking support surface" (Ex. A, claim 4, 32:38-39).   As discussed, all the limitations of Claim 1 are disclosed by Braitberg in view of the knowledge of a POSA or of Carnevali 1 (Ex. C), Carnevali 2 (Ex. D), or Carnevali 3 (Ex. E).   The additional limitation of claim 4 is also disclosed by Braitberg.   In particular, the rim is shown in Fig. 22 and is the walls surrounding 402.   Those walls, highlighted red in Fig. 22 below are recessed with respect to the docking support surface, which is highlighted blue.

Declaration of Jason D. Stigge



FIG. 22

### C.    Ground 2b: Claim 1 is Unpatentable as obvious over Kogan in view of the knowledge of a POSA or of Carnevali 1, Carnevali 2, or Carnevali 3

239.    For the reasons I set forth below, in my opinion, Claim 1 was obvious over Kogan in light of the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3.

### 1.    Claim 1

240.    Claim 1 of the '026 Patent recites the following limitations:

1.    1. A docking cradle, comprising:

a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts, the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a

docking support surface extending away from the back support surface; and

a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle, wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received.

241.   It is my opinion that each element of Claim 1 of the '026 Patent was present in the combination of Kogan and the knowledge of a POSA or Carnevali 1, Carnevali 2, or Carnevali 3, as explained below.

### a)   "A docking cradle comprising"

242.   The preamble of claim 1 recites a docking cradle.  Kogan discloses "a docking cradle."  Kogan is directed to a "docking station for a portable electronic device."  Kogan, Abstract.  The docking cradle (10) is shown in Figs. 1-6 of Kogan.

### b)   "a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a plurality of contacts"

243.   As discussed previously, during prosecution, PO acquiesced to the Examiner's assertion that Kogan disclosed a base receiver configured to receive an electronic device disposed in a removable cover having a male connector with a

Declaration of Jason D. Stigge

plurality of contacts.  Ex. B, p. 218.

244.   Accordingly, Kogan discloses that the docking cradle (10) includes a

base receiver (16) that is configured to receive an electronic device (14) disposed in

a removable cover (36) having a male connector (44) with a plurality of contacts

(42).  The various components can be seen in Figure 2 and Figure 3 of Kogan, shown

below.



245.   In particular, "the cradle receiving slots 18 are configured to receive

Declaration of Jason D. Stigge

cradle shells 32 each of which has an inner side 34 configured to match the shape of the cradle receiving slots 18 while an outer side 36 of each cradle shell 32 is configured to receive a corresponding mobile device 14 and hold the mobile device 14 in a desired orientation therein." Kogan, 2:19-24. "[C]ontacts of the connector on the bottom portion 40 are electrically connected to a shell connector 42 (e.g., a shell outer connector on a housing-facing surface) which, when the cradle shell 32 is received within the cradle receiving slot 18, is coupled to the connector 20 in a predetermined alignment. That is, where the connector 20 is a 20 pin connector, the shell connector 42 will have 20 contacts aligned with the pins of the connector 20 when the shell 32 is received within a cradle receiving slot 18." Kogan, 2:35-43.

> c) **"the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface."**

246. Kogan also disclosed "the base receiver comprising a back support surface to support a back of the removable cover and electronic device and a docking support surface extending away from the back support surface." In particular, "[t]he cradle receiving slots 18 are configured to receive cradle shells 32 each of which has an inner side 34 configured to match the shape of the cradle receiving slots 18 while an outer side 36 of each cradle shell 32 is configured to receive a corresponding mobile device 14 and hold the mobile device 14 in a desired orientation therein." Kogan, 2:19-24. In Figure 2 of Kogan below I have highlighted the back support

Declaration of Jason D. Stigge

surface green and the docking support surface (24) blue.



Figure 2

> d) "a female connector disposed within the docking support surface of the base receiver and comprising a plurality of contacts configured to connect with one or more of the plurality of contacts of the male connector when the male connector is received in the base receiver, the female connector defining a rim to guide proper mating of the male connector of the removable cover to the female connector of the docking cradle"

247.   Kogan also discloses this element.  A female connector (20, 22, 26, 28) disposed within a docking support surface (24) can be seen in Figure 6 of Kogan. As can also be seen in Figure 6 of Kogan, the female connector (20, 22, 26, 28) has a plurality of contacts configured to connect with one or more of the plurality of contacts (42) of the male connector (44, 46, 50) when the male connector (44, 46, 50) is received in the base receiver (16).  As explained in Kogan, "[s]pecifically, as shown in Figs. 2 and 6, the base 16 of the docking station 10 includes a plurality of

103

Declaration of Jason D. Stigge

cradle receiving slots 18, each of a standard size and shape. Each cradle receiving slot 18 includes a housing connector 20 (for example, a 20-pin connector) within a connector opening 22 formed in a lower surface 24 of the cradle receiving slot 18. A pair of alignment pin receiving holes 26 are formed in a circuit board 28 on which the connector 20 is mounted and a pair of screw receiving holes 30 are formed on either side of the connector opening 22." Kogan, 2:9-18.  When the cradle shell 32 is mounted in a cradle receiving slot 18, the aligning pins 50 enter the alignment pin receiving holes 26 of the cradle slot 18 to ensure that the contacts of the connector 42 are precisely aligned with the contacts of the connector 20." Kogan, 3:1-5.



Figure 6

248.   Similarly, "contacts of the connector on the bottom portion 40 are electrically connected to a shell connector 42 (e.g., a shell outer connector on a housing-facing surface) which, when the cradle shell 32 is received within the cradle receiving slot 18, is coupled to the connector 20 in a predetermined alignment.  That

is, where the connector 20 is a 20 pin connector, the shell connector 42 will have 20

contacts aligned with the pins of the connector 20 when the shell 32 is received

within a cradle receiving slot 18." Kogan, 2:35-43.

249.   The rim (of the connector opening 22 and the alignment pin receiving

holes 26) is highlighted purple below in Figure 6 of Kogan.



Figure 6

e)     **"wherein the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received"**

250.   The three published applications owned by PO (Carnevali 1-3) each

expressly admit that: "Most docking cradles either use some sort of biasing pogo pin

or biasing leaf spring contact in the docking connector.  Therefore, the protective

cover of the invention includes … "  (Ex. C, para. [0009], lines 1-3; Ex. D, p. 3,

lines11-12; Ex. E, para. [0010], lines 1-3) (emphasis added).  This admission had

been removed by PO from the specification of the CIP application that issued as the '026 Patent.   Nevertheless, biasing contacts were known by a POSA as commonplace well prior to February of 2014.  The published applications owned by PO (Carnevali 1-3) admit as much.

251.   To the extent that Kogan does not expressly show the biasing contacts in Fig. 22, it would have been obvious to incorporate biasing contacts that move when the connector is engaged.  A POSA would have been motivated to use spring-loaded pins in the device of Kogan because spring-loaded pins provide a highly-reliable electrical connection with greater durability and resistance to mechanical shock and vibration.  Spring-loaded connectors were the typical connector used in base units (battery/charger) for portable equipment such as mobile phones/radios, barcode readers, medical and other test instruments well prior to February of 2014. Spring-loaded pins typically comprise three components: a plunger, a barrel and a spring.  When a force was applied to the pin (like from inserting the cover and computing device) the spring would be compressed and the plunger moves inside the barrel.  Spring-loaded contacts were typically operated around their mid-stroke, with 25%-75% compression, and higher for lower profile springs. Typically, then, the movement of the spring (biasing contact) was from 0% compression when the removable cover and electronic device were not in the docking cradle to at least 25% compression when they were.

Declaration of Jason D. Stigge

252.   Therefore, claim 1 of the '026 Patent is unpatentable because it is obvious over Kogan (Ex. G) in view of the knowledge of a POSA or of Carnevali 1 (Ex. C), Carnevali 2 (Ex. D), or Carnevali 3 (Ex. E).

### D.   Ground 2c: Claim 1 is unpatentable over Braitberg in view of Li and/or Rudisill

253.   Even without the admissions in Carnevali 1-3 as to the knowledge of a POSA of the biasing contacts, claim 1 is unpatentable because it is obvious over Braitberg in view of Li and/or Rudisill.  As discussed above, all the limitations of claim 1 are expressly disclosed in Braitberg except for the limitation that "the contacts of the female connector are biasing contacts that move when the removable cover and electronic device are received."  Both Li and Rudisill, however, disclose connectors disposed within a docking support surface of a base receiver that have biasing contacts that move when the removable cover and electronic device are received.

254.   In Li, "the dock circuit connector includes 4 spring-loaded pins [15]." Li, ¶25.  "The spring-loaded pins [15] are fixed within the cradle dock [122]."  Li, ¶25.  The arrangement can be seen in Figs. 1-4 of Li, reproduced below.

Declaration of Jason D. Stigge



255.   "Specifically, there is the claimed dock circuit connector, which includes spring-loaded pins and dock wire leads.  The claimed spring-loaded pins are fixed within the claimed cradle dock." Li, [0009].  "Specifically, there is the claimed case circuit connector, which includes metal hardware pieces and case wire leads.  The claimed metal hardware pieces and the claimed spring-loaded pins form a contact-based electrical connection."  Li, [0010].  When the removable cover (mobile phone case [2]) and the electronic device (mobile phone [3]) are received in the docking station (dock unit [1]) the female connector spring-loaded pins of the docking station (dock unit [1]) move.  As described in Li, the female port is on the docking cradle and the male port is on the mobile phone case.  Li, paragraphs [0014], [0027], [0029].

256.   A POSA would have been motivated to use the spring-loaded pins of Li in the device of Braitberg because spring-loaded pins provide a highly reliable

electrical connection with greater durability and resistance to mechanical shock and vibration. Spring-loaded connectors were the typical connector used in base units (battery/charger) for portable equipment such as mobile phones/radios, barcode readers, medical and other test instruments prior to February of 2014. Spring-loaded pins typically comprise three components: a plunger, a barrel and a spring. When a force was applied to the pin (like from inserting the cover and computing device) the spring would be compressed and the plunger moves inside the barrel. Spring-loaded contacts were typically operated around their mid-stroke, with 25%-75% compression and higher for lower profile springs. Typically, then, the movement of the spring (biasing contact) was from 0% compression when the removable cover and electronic device were not in the docking cradle to at least 25% compression when they were.

257. For the reasons I set forth above, in my opinion, Claim 1 was obvious over Braitberg in light of Li.

258. In addition, Claim 1 was obvious over Braitberg in light of Rudisill. As more generally explained in Rudisill, "[m]any conventional reversible connectors depend upon overcoming a mechanical force during the mating process in order to provide a residual biasing force between the electrical contacts." Rudisill, [0006]. More specifically, Rudisill discloses electrical contacts that include magnets where "[o]ne or both sides of the contact pairs may be compliant under the magnetic

Declaration of Jason D. Stigge

attraction of the magnetic elements, and the contacts 5 and 16 are compressed under the magnetic force, providing electrical and mechanical connection." Rudisill, para. [0109]. In addition, Rudisill discloses that "spring members 102 may be included to provide contact biasing force behind the ferromagnetic elements." Rudisill, para. [0104]. The arrangement is shown in Figs. 31 and 49 of Rudisill, reproduced below.



259. A POSA would have been motivated to incorporate the teachings of how to bias contacts such that the contacts move when the removable cover and electronic device are received because this creates a highly-reliable electrical connection with greater durability and resistance to mechanical shock and vibration.

**E.  Ground 3a: Claim 10, 11, 14 and 19 are Unpatentable as Obvious over Song in view of the knowledge of a POSA and/or Li and/or Rudisill**

260. For the reasons I set forth below, in my opinion, Claim 10 was obvious over Song in light of the knowledge of a POSA and/or Li and/or Rudisill.

*1.  Claim 10*

261. Claim 10 of the '026 Patent recites the following:

Declaration of Jason D. Stigge

10.  A docking system, comprising:

a protective for an electronic device (Ex. A Fig. 1 ref 1), the cover comprising a shell forming an interior cavity to receive the electronic device, a male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug, wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover; and

a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover, the docking connector defining a rim to guide proper mating of the contactor to the docking connector.

262.   It is my opinion that each element of Claim 10 of the '026 Patent was present in the combination of Song and the knowledge of a POSA and/or Li and/or Rudisill.

### a)      "A docking system"

263.   The preamble of claim 1 recites a docking system.  Song discloses "a docking system."  Song discloses a docking cradle as shown in Fig. 1-3.

Declaration of Jason D. Stigge



**b)** **"a protective cover for an electronic device, the cover comprising a shell forming an interior cavity to receive the electronic device"**

264.   Song discloses an electronic device (1) for use in the docking system. To the extent that Song does not expressly disclose a cover on the electronic device, it was common knowledge well prior to February 2014 to use a protective cover for an electronic device where the cover is a shell that forms an interior cavity to receive the electronic device.

c)    **"a male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug"**

265.   Song discloses a male plug with a plurality of connectors for mating with a female socket of the electronic device.  As can be seen in Fig. 4 of Song, male plug (5) with connectors (11) is mated with the female socket of the electronic device.  In particular, "coupling jack 5 [is] formed at the intermediate coupling jack B which is constantly coupled to the data connector hole 3" on the electronic device. The connectors of coupling jack 5 are shown as 11 in Fig. 4 and Fig. 5 of Song. When the electronic device has a cover, there is typically a hole where the data connector hole of the electronic device is.  To mate with the female socket of the electronic device, the male plug must extend into the interior cavity of the shell in an arrangement for mating with the female socket of the device.  Therefore, a POSA would have found it obvious to use a cover with the electronic device to protect the electronic device and would have understood that the male plug that mates with the female socket of the electronic device would need to extend into the interior cavity of the shell of the cover in order to mate with the female socket.  Likewise, in Song metal member 8 has contacts 11-1 that would be adjacent to the exterior of the shell of the cover.  The contacts 11-1 are electrically coupled to connectors 11 as can be

seen in Fig. 5 of Song.   "When the two jacks A and B are completely coupled to each other as illustrated in Fig. 5, the multiple handsfree data coupling terminals 10 connected to an electric line 10-1 buried in the data line fixing part 4 are connected to multiple surface-contact terminals 11-1 formed in the intermediate coupling jack B and are re-connected to the cellular phone 1 through the multiple data terminals 11 formed in the coupling jack 5, and thereby the entire coupling operation of the cellular phone 1 to the handsfree 2 is completed."  Song, 3.



Declaration of Jason D. Stigge

266.   A specific example of how to incorporate a cover on the electronic device can be seen in Rudisill, where in Fig. 22 and Fig. 24 shown below, the male connector 1 comprises a plurality of connectors extending into the interior cavity of the shell of the cover to mate with the female socket of the device 9.  Likewise, the contactor 42 has a plurality of contacts adjacent to an exterior of the shell of the cover 40.  As can be seen, the contacts of 42 are electrically connected to connector 1.



267.   Similarly, Li also discloses a male plug 26 comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts 28 is adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug.

Declaration of Jason D. Stigge



Fig. 4

    **d)**    **"wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover"**

268.   As discussed, to the extent that Song does not expressly disclose a cover on the electronic device, a POSA would understand the benefit of a cover that extends over parts of the back, front, and side surfaces to protect the electronic device and ensure that the cover remains secure on the electronic device.  This type of cover was typically used with electronic devices such as cellular phones well prior to February of 2014.  In addition, the cover disclosed in Li and the cover disclosed

in Rudisill are configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover.

> e) **"a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover"**

269.   Song discloses this element, as can be seen in Fig. 1-3.  A POSA would understand that when the electronic device 1 is used with a cover the docking cradle would be configured to receive both the electronic device and the cover.   The docking connector 2 has the base receiver at the lower portion.   The docking connector A is disposed on the base receiver.   The docking connector A has numerous contacts 10 that are positioned to connect with the contacts 11-1 of the contactor 8 of the protective cover (as discussed previously A POSA would be motivated to and know how to attach the contactor 8 to the protective cover and this was also taught in Li and Rudisill).

> f) **"the docking connector defining a rim to guide proper mating of the contactor to the docking connector"**

270.   Song discloses this element (as do Rudisill and Li).  As seen in Fig. 4, the docking connector A includes a rim 6 to guide proper mating of the contactor 9 to the docking connector A.

Declaration of Jason D. Stigge



271.   As discussed, A POSA would have been motivated to modify Song slightly to be able to accommodate electronic devices with a protective cover to provide additional protection for the electronic device.

272.   Thus, Song in view of Li and/or Rudisill discloses all recitations of claim 10 and renders claim 10 unpatentable as being obvious.

     *2.*    *Claim 11*

273.   Claim 11 of the '026 Patent recites the following: The docking cradle of claim 10, wherein one of the contactor and the docking connector comprises a

Declaration of Jason D. Stigge

female portion and a different one of the contactor and the docking connector comprises a male portion complementary to the female portion.

274.   As discussed, all the elements of claim 10 are taught in the combined teaching of Song and Li and Rudisill in view of the knowledge of a POSA and/or Li and/or Rudisill.

275.   .  In addition, in Song the contactor B has a male portion (8) that is complementary to the female portion of A.  Therefore, claim 11 is unpatentable under 35 U.S.C. §103(a) over Song in view of the knowledge of a POSA and/or Li and/or Rudisill.

> ### 3.    *Claim 14*
>
> Claim 14 of the '026 Patent recites the following: The docking cradle of claim 10, wherein the base receiver of the docking cradle comprises a back support surface to support a back of the cover and electronic device and a docking support surface extending away from the back support surface.

276.   The docking cradle (2) of Song has a back portion that engages and supports the back of the electronic device (2).

Declaration of Jason D. Stigge



FIG. 1

277.   Similarly, Li has a back portion (12) that engages and support the back of the electronic device as can be seen in Fig. 1 of Li. Additionally, Li has a docking support surface extending away from the back support surface.



图 1

Declaration of Jason D. Stigge

278.    Therefore, Claim 14 is unpatentable under 35 U.S.C. §103(a) over Song in view of Li and/or Rudisill.

### 4.    Claim 19

Claim 19 of the '026 Patent recites the following: The docking cradle of claim 10, wherein the contacts of the docking connector are biasing contacts that move when the cover and electronic device are received.

279.    As discussed, a POSA would have been motivated to include biasing contacts as claimed and would have known how to modify the contacts of Song.  In addition, both Li and Rudisill disclose examples of the biasing contacts.  Li discloses that the contacts 28 of the adapter 23 engage "spring-loaded pins" 15 of the connector of the docking station 2.  Likewise, Rudisill discloses that the contacts of the cover 40 include magnets that are magnetically attracted to ferromagnetic elements in the contacts of the docking cradle.  Rudisill also discloses spring members 102 that provide a biasing contact.  A POSA would have been motivated to modify the contacts of Song or simply incorporate the contacts of Li or Rudisill as previously discussed.  Therefore, claim 19 is unpatentable under 35 U.S.C. §103(a) over Song in view of Li and/or Rudisill.

### F.    Ground 3b: Claim 15 is Unpatentable under 35 U.S.C. ¶103(a) over Song in view of the knowledge of a POSA or Li or Rudisill and in further view of Braitberg

280.    Claim 15 reads as follows: The docking system of claim 14, wherein the rim of the docking connector is recessed with respect to the docking support

surface.

281.   As discussed, all of the limitations of Claim 14 are met by the combination discussed in Ground 3a above.  In addition, in Braitberg, "the rim is recessed with respect to the docking support surface."  (Ex. B p. 190).  PO did not contest these assertions by the Examiner.  A POSA would be motivated to combine Braitberg with Song, Li, and Rudisill in the manner noted above and for the reasons set forth above.

### G. Ground 4a: Claims 10, 11, and 19 are Anticipated by, or, in the Alternative, Obvious in View of Rudisill.

#### 1. Claim 10

282.   Claim 10 of the '026 Patent recites the following:

10.  A docking system, comprising:

a protective cover for an electronic device (Ex. A Fig. 1 ref 1), the cover comprising a shell forming an interior cavity to receive the electronic device, a male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug, wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover; and

a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on

the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover, the docking connector defining a rim to guide proper mating of the contactor to the docking connector.

283.   It is my opinion that each element of Claim 10 of the '026 Patent is present in Rudisill.

### a)   "A docking system"

284.   The preamble of claim 1 recites a docking system.  Rudisill discloses "a docking system."  Rudisill discloses a docking cradle as shown in Figs. 31-33 and 49.

### b)   "a protective cover for an electronic device, the cover comprising a shell forming an interior cavity to receive the electronic device"

285.   Rudisill disclosed this element.  As can be seen in Figure 31 of Rudisill, the cover 40 for the electronic device 9 is a shell that form an interior cavity to receive the electronic device 9.

### c)   "a male plug comprising a plurality of connectors extending into the interior cavity of the shell in an arrangement for mating with a female socket of the device, and a contactor comprising a plurality of contacts adjacent to an exterior of the shell and electrically coupled to one or more of the connectors of the plug"

286.   As discussed above, Rudisill disclosed this element.  As can be seen in Fig. 22 and Fig. 24 of Rudisill, shown below, the male connector 1 comprises a

plurality of connectors extending into the interior cavity of the shell of the cover to mate with the female socket of the device 9.   Likewise, the contactor 42 has a plurality of contacts adjacent to an exterior of the shell of the cover 40.   As can be seen, the contacts of 42 are electrically connected to connector 1.



d)   "wherein the cover is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover"

287.   As discussed, this element is disclosed in Rudisill.  The cover disclosed in Rudisill is configured and arranged to extend over at least a portion of a back surface, a front surface, and each of four side surfaces of the electronic device to hold the electronic device within the cover.

Declaration of Jason D. Stigge

**e)** **"a docking cradle configured to receive the cover and comprising a base receiver to receive the cover and a docking connector disposed on the base receiver and comprising a plurality of contacts positioned to connect with one or more of the plurality of contacts of the contactor of the protective cover"**

288.   Rudisill discloses this element.  Figs. 24, 31 and 32 show the cover 40 being received onto the docking station 11, with the connector 42 of the cover 40 engaged with the contact pads 16 of the docking station 11.  Rudisill discloses that docking station 11 includes connector 32 having contact pads, and the contact pads 16 engage with corresponding exterior contacts 61 of the case connector 42.

**f)** **"the docking connector defining a rim to guide proper mating of the contactor to the docking connector"**

289.   Rudisill discloses this element.  As seen in Fig. 4, the docking connector A includes a rim 6 to guide proper mating of the contactor 9 to the docking connector A.

290.   Thus, Rudisill discloses all recitations of claim 10 and renders claim 10 unpatentable as anticipated.

### 2.   *Claim 11*

291.   Claim 11 of the '026 Patent recites the following: The docking cradle of claim 10, wherein one of the contactor and the docking connector comprises a female portion and a different one of the contactor and the docking connector comprises a male portion complementary to the female portion.

Declaration of Jason D. Stigge

292.   As discussed, Rudisill discloses all the elements of Claim 10.  The '026 Patent uses the term "contactor" to refer to an exterior surface proximate to electrical contacts of the adapter (or cover).  As seen in Fig. 24, the contacts 61 of the case connector 42 are indented and are the recited female portion.  The contacts 61 are engaged with the outwardly projecting contacts 109 (the male portion of the docking connector 16).  Therefore, Rudisill anticipates Claim 11.



### 3.   Claim 19

293.   Claim 19 of the '026 Patent recites the following: "The docking cradle of claim 10, wherein the contacts of the docking connector are biasing contacts that move when the cover and electronic device are received." As discussed, Rudisill discloses all the elements of Claim 11.  As also discussed, and as can be seen in Fig. 24 of Rudisill, Rudisill discloses that the connector includes contacts 16 that are magnetically urged (*i.e.* biased) by magnets 48 into engagement with external contacts 61 of the case connector 42.  Rudisill also discloses spring members 102 and teaches that foams or other resilient materials can be substituted to provide this

Declaration of Jason D. Stigge

mechanical biasing.  Therefore, Rudisill anticipates claim 19.

294.   Insofar as Rudisill anticipates claims 10, 11, and 19 of the '026 Patent, Rudisill also renders these claims obvious to a POSA. That is, to the extent there are any differences, real or perceived, between the device disclosed by Rudisill and the device recited in claims 10, 11 and 19 of the '026 Patent, these differences would be obvious to a POSA.

## XIV.  NO SECONDARY CONSIDERATIONS

295.   I am not aware of any evidence of secondary considerations that suggest the Challenged Claims of the '026 Patent are not obvious.

296.   I reserve the right to provide my opinion on any such evidence that Patent Owners may later submit in this proceeding.

## XV.    THE ASSERTED CLAIMS OF THE '026 PATENT ARE NOT ENTITLED TO THE FEBRUARY 23, 2015 FILING DATE OF PRIORITY APPLICATION PCT/US2015/017131

Claims 1, 2, 4, 6, 10, 11, 12, 14, 15, 17, ~~18~~, and 19 of the '026 Patent are being asserted in this matter (the "Asserted Claims"). In my professional opinion, none of the Asserted Claims of the '026 Patent are entitled to the February 24, 2014, filing date of provisional application Ser. No. 61/943,986 (the '986 Application) because the '986 Application does not enable the Asserted Claims and does not include a written description of the claimed subject matter. The claim language is also indefinite. Therefore, in my professional opinion, the Asserted Claims of the '026

Patent are invalid under 35 U.S.C. § 112(a) and (b). See ProClip's corresponding claim chart in this matter, attached hereto and incorporated herein as Exhibit BI. I agree with and endorse the substantive remarks in Exhibit BI as my own.

297. In my professional opinion, none of the Asserted Claims of the '026 Patent are entitled to the March 21, 2014, filing date of application Ser. No. 14/222,320 (now U.S. Pat. No. 9,331,444, which is not asserted in this matter). This is because the '444 patent does not enable the claims and does not include a written description of the claimed subject matter of the Asserted Claims. The claim language is also indefinite. Therefore, in my professional opinion, the Asserted Claims of the '026 Patent are invalid under 35 USC § 112(a) and (b). See ProClip's corresponding claim chart in this matter, attached hereto and incorporated herein as Exhibit BJ. I agree with and endorse the substantive remarks in Exhibit BJ as my own.

298. In my professional opinion, none of the Asserted Claims of the '026 Patent are entitled to the August 21, 2014, filing date of provisional application Ser. No. 62/040,037 because the '037 application does not enable the claims and does not include a written description of the claimed subject matter of the Asserted Claims. The claim language is also indefinite. Therefore, in my professional opinion, the Asserted Claims of the '026 Patent are invalid under 35 U.S.C. § 112(a) and (b). See ProClip's corresponding claim chart in this matter, attached hereto and incorporated herein as Exhibit BK. I agree with and endorse the substantive remarks

Declaration of Jason D. Stigge

in Exhibit BK as my own.

299.    The patent application that matured into the '026 Patent (Pat. Appl. Ser. No. 14/936,517, filed Nov. 9, 2015) claims priority as a "continuation-in-part" to four (4) earlier patent applications (one of which is a PCT application) and two provisional applications. I understand that when an application is designated a "continuation-in-part" or "CIP," additional material has been added to the application as comparted to the next-earlier application in the chain of applications. The priority claim for the '026 Patent is as follows:

| Pat. No. | Appl. No. and Filing Date | Publication No. and Publication Date | Relationship |
|---|---|---|---|
| **9,706,026** | 14/936,517<br>Nov. 9, 2015 | US 2016/0065702<br>March 3, 2016 | is a CIP of |
| **9,602,639** | 14/829,378<br>Aug. 18, 2015 | 2015/0358439<br>Dec 10, 2015 | is a CIP of |
| **9,529,387** | 14/754,492<br>Jun. 29, 2015 | 2015/0301561<br>Oct 22, 2015 | is a CIP of |
| | **PCT/US2015/017131<br>Feb. 23, 2015** | WO/2015/127376<br>Aug 27, 2015 | is a CIP of |
| **9,331,444** | Ser. No. 14/222,320<br>Mar. 21, 2014<br><br>and also claims priority to Prov. 62/040,037<br>Aug. 21, 2014 | 2015/0244126<br>Aug 27, 2015 | which claims priority to |
| | Prov. 61/943,986<br>Feb. 24, 2014 | | |

300.    This chain of applications is notable because new matter was added at each new CIP application, thus calling into question whether each Asserted Claim

of the '026 Patent is entitled to the filing date of the earliest application in the chain. As discussed previously in this report, none of the Asserted Claims of the '026 Patent are entitled to the filing date of provisional application Ser. No. 61/943,986 (Feb. 24, 2014), nor the filing date of non-provisional application Ser. No. 14/222,320 (Mar. 21, 2014), nor the filing date of provisional application Ser. No. 62/040,037 (Aug. 21, 2014).

301.   It is also my opinion that the Asserted Claims of the '026 Patent are not entitled to the filing date of PCT/US2015/017131 (filed Feb. 23, 2015; published Aug. 27, 2015, as WO/2015/12737; hereinafter "the PCT Application) because the PCT application does not enable the Asserted Claims and does not contain a written description of the Asserted Claims. My analysis is contained in the claim chart attached hereto as Exhibit BL.

302.   The '026 Patent has **64 figures**: Figs. 1-49, 50A, 50B, 51A, 51B, 51C, 51D, 52A, 52B, 52C, 52D, 52E, 52F, 53, 54A, and 54B. In contrast, the PCT Application has only **49 figures**. The PCT Application contains Figs. 1-49, which are very nearly identical as Figs. 1-49 of the '026 Patent, but differ in the presentation of several critical reference numerals. Thus, fifteen (15) additional drawings were filed between the time the PCT Application was filed and the time the application that matured into the '026 Patent was filed.

303.   In my professional opinion, as noted in the claim chart attached hereto

and incorporated herein as Exhibit BL, the PCT Application does not contain an enabling disclosure nor an adequate written description of any of the Asserted Claims of the '026 Patent. The Asserted Claims of the '026 Patent are thus not entitled to the filing date of the PCT Application.

304.   As noted in paragraph 53 above, there was a restriction/election of species requirement in the application that matured into the '026 Patent (Appl. Ser. No. 14/936,517, filed November 9, 2015; "the '517 Application"). In response, PO elected Species 13 corresponding to Figures 54A-54B.   (Ex. B p.181-182)." However, Figures 54A and 54B do **not** appear in the immediately preceding application in the priority claim, namely Application Ser. No. 14/829,378, filed on August 18, 2015 ("the '378 Application"). The '517 Application (which matured into the '026 Patent) claims priority as a continuation-in-part of the '378 Application.  In short, in response to the restriction/election of species requirement in the '517 Application, NPI elected a species that is **not** illustrated, and thus is **not** disclosed, in the '378 Application. Figures 54A and 54B of the '517 Application, which the PO elected as its chosen species of the claimed invention of the subsequent '026 Patent, do **not** appear in the '378 Application. These two figures appear for the first time only in the '517 Application. Therefore, the resulting claims of the '026 Patent are entitled to a filing date no earlier than the filing date of the '517 Application itself, namely November 9, 2015. That is the first application in the

chain of applications in the priority claim in which Figs. 54A and 54B appear.

305.   While I noted that I have rendered the above opinions on the assumption that the claims of the '026 Patent are entitled to the filing date of the earliest provisional application in the priority claim, it is also my professional opinion that the claims of the '026 Patent are only entitled to the actual filing date (November 9, 2015) of the application that matured into the '026 Patent (U.S. Application No. 14/936,517, hereinafter the '517 Application).  This is because the '517 Application is a continuation in part of the U.S. Patent Application No. 14/829,378 (hereinafter the '378 Application), filed on August 18, 2015.  Material was added to the '517 Application which was not present in the '378 Application, and which is necessary to provide enablement and written description of the invention ultimately issued in the claims of the '026 Patent.

## XVI.  CONCLUSION

306.   For the reasons set forth above, in my opinion, Claims 1, 2, 4, 6, 10, 11, 12, 14, 15, 17, and 19 of the '026 Patent are invalid as anticipated or obvious.

307.   I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Declaration of Jason D. Stigge

308.   I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6, 2021 in Omaha, Nebraska

_____

Jason D. Stigge, P.E.